THE STATE v. HENRY ODBUR and FRED SHADE, Appellants.—
295 S. W. 734.

Division Two, June 3, 1927.

1. **MURDER: Sufficient Evidence: Presumption of Consequences.** Where defendant voluntarily sought out and renewed a fight with deceased, and the jury could well have found that he inflicted the fatal knife wounds before he was struck down by a club in deceased's hands, and that deceased did not use the club until he received the fatal stab and then immediately ran away, the court cannot rule that the evidence was insufficient to support a verdict of guilty of murder in the second degree. The defendant must be presumed to have intended the consequences of his use of the knife, striking as he did at the throat of deceased and cutting his windpipe.

2. ————: **Manslaughter: Instruction.** Notwithstanding the jury may well have found appellant guilty only of manslaughter, that feature of the case cannot be reviewed where his motion for a new trial did not properly claim error in the instructions on manslaughter, in view of Section 4079, Laws 1925, page 198.

3. **ASSIGNMENT: Sufficiency of Evidence.** A motion for a new trial asigning error to the action of the court in overruling appellant's demurrer to the evidence requires the appellate court to consider the entire record and all the evidence. No form of an assignment is required by new Section 4079, Laws 1925, page 198, to place upon the court the duty to so far examine the evidence as is necessary to determine whether it is sufficient to support the verdict, but if the motion for a new trial shows a proper and timely demurrer to the evidence the court will determine whether a case was made for the jury.

4. **ACCESSORY: Presence: Enmity: Knowledge.** The mere presence of one at the commission of a crime is not sufficient to constitute aiding and abetting. Nor is an expression of enmity against the deceased, especially if made after the fatal encounter, sufficient to support a charge of aiding and abetting.

5. ————: **Concert of Action.** There being no evidence of any conspiracy or concert of action between the man who inflicted the fatal stab and the appellant who rode with him on a horse towards his home, and none of any words of encouragement or of any acts of participation in the fatal encounter, and none that appellant had any knowledge at all of the intention of the principal other than to engage in a fist fight with deceased, appellant's mere presence, and perhaps an expletive common and natural to his people, made after the encounter was ended, although it may have indicated some degree of enmity towards deceased, are not sufficient to sustain a verdict finding him guilty as an accessory to the murder in the second degree.

6. ————: **Flight.** The fact that appellant after the fatal encounter ran away to another state because he was afraid of a mob which he heard was gathering is a circumstance that may go to the jury in support of a charge of guilt, but it is not sufficient of itself to make a submissible case.

7. ————: **Holding Horse.** Evidence that the person charged as accessory caught and held the principal's horse after the principal had dismounted and gone towards deceased, to keep the horse from running away, is not evidence of aiding and abetting in the assault.

8. ———: **Fist Fight: Resort to Deadly Weapon.** If two combine to fight a third with fists, and death accidentally results from the blow inflicted by one, the other also is responsible for the homicide; but if one resorts to a deadly weapon without the other's knowledge or consent, he alone is liable. But even that rule is not available to the State, where the two did not combine to fight deceased with their fists, and there is no evidence that the supposed accessory took any part in the fight, did not even encourage the other, but only naturally went long when the other announced that he was going back to whip the deceased if he and the others would go back and see a fair fight.

---

Corpus Juris-Cyc. References: Criminal Law, 16 C. J., Section 119, p. 132, n. 98; Section 120, p. 132, n. 3; Section 121, p. 132, n. 6; 17 C. J., Section 3350, p. 89, n. 67; Section 3351, p. 89, n. 70. Homicide, 30 C. J., Section 347, p. 140, n. 50; Section 560, p. 314, n. 54, 55.

Appeal from Pike Circuit Court.—*Hon. Edgar B. Woolfolk,* Judge.

AFFIRMED *as to Odbur;* REVERSED AND REMANDED *as to Shade.*

*Davis Benning, Andrew J. Murphy, Jr.,* and *Ras Pearson* for appellants.

(1) Appellant Fred Shade contends that as to him the trial court committed error in not giving the instruction in the nature of a demurrer offered at the close of the State's evidence and again at the close of all the evidence. Notwithstanding the trial court held otherwise, appellant Shade earnestly insists that there is not one element of conspiracy to kill, murder or to do great bodily harm or malice aforethought in this case; that the evidence does not show that he aided, counselled, abetted, procured or incited his co-defendant, Henry Odbur, in and about the premises. State v. Porter, 276 Mo. 395, 207 S. W. 774; State v. Bell, 289 S. W. 622; State v. May, 136 Mo. 136; State v. Thompson, 293 Mo. 116; State v. Thompson, 238 S. W. 786; State v. Parr, 296 Mo. 406, 246 S. W. 906; State v. Recke, 278 S. W. 999; State v. Stemmons, 262 S. W. 706; State v. Hickman, 95 Mo. 322. (2) The court committed error in submitting the question of murder in the first degree and murder in the second degree to the jury. Under the evidence there is no offense higher than manslaughter. Under the very best view for the State, all we have here is two foolish, ignorant, country boys starting in for a "fist fight," "a fair fist fight;" after the fight starts the deceased uses a club, defendant uses a knife; no premeditation, no deliberation; no malice aforethought; a fist fight, a misdemeanor. Kelly's Criminal Law (3 Ed.) sec. 351; State v. Kretschmar, 232 Mo. 29, 42; State v. Eastman, 240 Mo. 241.

· *North T. Gentry,* Attorney-General, and *A. M. Meyer,* Special Assistant Attorney-General, for respondent.

The assignments raise, or attempt to raise, a question on the legal sufficiency of the evidence to sustain the verdict as against the defendant Fred Shade. The assignments are not sufficient under the 1925 Act to raise the question of the sufficiency of the evidence. When the evidence is complained of as insufficient, the appellant should specify, in his motion for a new trial, what element or elements of the crime, if any, were not shown or proved by the evidence. There was substantial evidence to show that defendant Shade was present, aiding, abetting and assisting Odbur at the commission of the crime.

WHITE, J.—Defendants Henry Odbur and Fred Shade were charged with the murder, March 22, 1924, of Ernest Willett. They were tried and convicted of murder in the second degree, November 20, 1925, in the Circuit Court of Pike County; the punishment of Odbur was assessed at thirty-five years, and that of Fred Shade at ten years, in the penitentiary. They appealed in due form.

The scene of the homicide was on the levee along the Mississippi River in Pike County. The actors were habitues of the river bottom, small tenant farmers or farm hands. The defendants, and some of their witnesses, had lived on each side of the river, but apparently always in the bottom. But wherever they lived they had not been hampered by the entanglements of education. They added to the illiteracy percentage of Illinois or Missouri, dependent upon which side of the river the census enumerator found them. Ernest Willett, the man killed, was twenty-one years of age; Odbur was twenty-one, and had been married three years. Shade was twenty-four, had been married five years, and could neither read nor write, yet he was not without certain cultural accomplishments, for he played the French harp.

The evidence most favorable to the State, which must have been believed by the jury, shows that on the night of March 22, 1924, a dance was had at the home of one Aaron Niffen, at which Shade furnished the music with his French harp. This habitation was outside the levee—which means between the levee and the river. It contained one room in which was all the furniture of the household. Thither went Shade and Odbur together on horseback; they hitched their horses in a shed across the levee from the house. Shade's wife with her two babies had gone there early in the afternoon, Mrs. Niffen being her sister. Some twenty-five or more persons were present, including Willett, who later was killed. There had been no ill-feeling or difficulty between the defendants and Willett at any time. There

was no trouble at the party. The dances were square; none of the demoralizing effects of the modern round dances.

The party broke up at eleven o'clock, and Ernest Willett started home, walking with two girls, Bertha Blansett, seventeen years old at the time, and her sister Flossie Blansett, fifteen years old. With them were two boys, George Shade, fifteen, and Everett Shade, thirteen. These five persons walked on the levee up the river, which at that point runs from the northwest. Before those left the house, Shade and Odbur had gone across the levee to the shed to get their horses. As Willett and the girls got upon the levee Odbur called to Bertha Blansett to come down there, he wanted to see her, or words of similar import. Ernest Willett had been "keeping company" with Bertha Blansett for some time. He resented this remark as having some insulting intimation; said he would make Odbur take it back, and offered to meet him half way and fight. He walked half way down the levee, applied to Odbur a vile epithet, but the latter mounted his horse and with Shade rode away down the road. That was the first encounter of the evening.

Willett and his party then continued their journey on the levee. In the meantime a wagon left the party, driven by one Shoemaker, containing Shade's wife and two babies, a boy named Lester Niffen, and two men, William Cozad and Fred Nelson. Thus the three parties started home from the dance in the general direction up the river, those in the wagon and the men on horseback pursuing the road, and the party on foot walking on the levee. Presently Willett and those with him came to where the road crossed the levee, and there met Shade and Odbur. There occurred the second encounter of the evening. Odbur suggested that Willett wanted to fight "back there" and asked if he wanted to fight. Willett replied that he was ready to fight a "fair fist fight." Abusive language was exchanged between the two men and they began to fight. The evidence is conflicting as to which struck the first blow. According to some, Willett knocked Odbur down; according to others, Odbur knocked Willett down, and Willett got up and ran away. According to the two girls, Odbur drew a knife, already open, from his pocket and struck at Willett with it. Willett dodged the knife and ran away, followed a short distance by Odbur, in pursuit, who called to Bertha that her "pal was hid in the weeds." The girls saw Willett no more alive. Thus ended the second encounter, with no casualties.

A little later Willett went to the house of one Harve Niffen, near by, and tried without success to borrow a gun. Further on the wagon containing Mrs. Fred Shade, her two babies, Lester Niffen, Cozad and Nelson, were overtaken by Shade and Odbur. Odbur told them he came near having a fight "back there;" that Willett had called him a vile name. He thought he would go back and whip him, and asked

if "you fellows will go back and see fair play?" Cozad promptly accepted the invitation, volunteering the information that "fight" was his "middle name." So the four went back, Shade and Odbur on horseback, Cozad and Nelson on foot; they came upon Willett who was, it seems, at or near the fence along the levee. He and Odbur met at the fence and were seen to fight. This was the third and last encounter. According to all the evidence Willett struck Odbur on the head with a piece of burnt timber, which left its mark and laid Odbur senseless. He was picked up by the other men, put on his horse and taken home. Later in the night the boy, Lester Niffen, saw Odbur take out his knife with blood on it. Odbur said he struck at Willett with that knife, and didn't know whether he had hit him or not, but he guessed he had. Other evidence showed that he had a knife with blood on it that night, and said that he had struck three times at Willett with his knife. After striking Odbur down Willett ran away into the weeds and was seen no more alive. His body was found the next day about a quarter of a mile from the house where the dance had been, and about twenty-five yards from where horse tracks and foot-prints showed the ground was trampled. A cut was across his windpipe, which partially severed it; a stab straight down in his left shoulder, which severed an artery, caused him to bleed to death, according to the testimony of Dr. Lewellen. The physician said Willett might have run a hundred yards after that wound before he expired.

None of the parties, including Odbur, knew anything about the fatal effects of the fight until the body was found the next day. Odbur's remarks and conduct after the fight indicated he was not conscious of having delivered a fatal blow. The next day the news went around that a mob was forming to lynch Odbur and Shade. The evidence is uncontradicted that they were frightened by that rumor. They were put across the river to the Illinois side by some friends, stayed away several months and went under assumed names until they finally were captured and brought back for trial.

I. It is urged here that the case should be reversed and remanded as to Odbur, because a case was not made out against him, and his demurrer to the evidence should have been sustained.

**Sufficient Evidence.** It is doubtful whether, in the beginning, Odbur intended anything offensive in addressing Bertha Blansett, or that Willett had any reason for resentment. Odbur showed no inclination to fight, but later, probably thinking of the insulting epithet applied to him by Willett, prepared with an open knife. In the second encounter, where the blows were struck, it is undisputed that Willett stipulated for a "fair fist fight," and there was nothing to show that he intended to resort to any other weapon than his fists.

There was ample evidence for the jury to believe that Odbur at that time attempted to use his knife with intent to inflict serious injury or to kill. No injury occurred to Willett then, because he later appeared at the house of Harve Niffen with no appearance of wounds upon his body. In the third encounter, the evidence shows, the witnesses did not appear to see all the blows which were struck and were not definite about what Odbur did. From his subsequent statements, and the blood on his knife, the jury could properly find that he must have inflicted the knife wounds before he was struck down; that Willett did not use the club until he receiver the fatal stab, and immediately ran away so fast that his speed was characterized as "running like a greyhound," though wounded as he was.

Odbur must be presumed to have intended the consequences of his use of the knife, striking as he did at the throat of Willett. The jury might very well have found him guilty only of manslaughter, but the defendant in his motion for new trial did not properly claim error in the instruction on manslaughter, under Section 4079, as re-enacted in 1925. [Laws 1925, p. 198; State v. Standifer, 289 S. W. 856. ] No other errors, so far as Odbur is concerned, are properly saved for review in the motion for new trial.

II. In the case of Shade, his attorneys assert that a case was not made out against him for aiding and abetting Odbur in the perpetration of the crime. The Attorney-General claims that **Assignment: Demurrer to Evidence.** the motion for new trial did not sufficiently save the point under the Act of 1925. The motion assigns error to the action of the trial court in overruling Shade's demurrer to the evidence. That sufficiently raised the question and requires us to consider the entire record. We must examine *all* the evidence, and there is no form of assignment of error which would relieve us of that duty in determining whether a case was made out.

III. It is not claimed that there was any conspiracy between Shade and Odbur to inflict injury on Willett. There was no evidence **Accessory.** of any trouble, nor of any designs upon him until after the party broke up, and after the first verbal encounter while the defendants were getting their horses. Nor is there anything in the evidence anywhere to show any concert of action or purpose between Shade and Odbur. There is no evidence that Shade said a word at any one of the three times in which the combatants met. On the contrary, the evidence is that he said nothing and did nothing.

The Attorney-General mentions several items of evidence which he claims are sufficient to submit the issue of Shade's participation to

the jury. First, he was present at all times. The mere presence of one at the commission of a crime although he may favor its commission, is not sufficient to constitute aiding and abetting. [16 C. J. 132; State v. Larkin, 250 Mo. l. c. 234.] Odbur and Shade came to the party together, and naturally rode away together, and Shade's presence at all times during the various encounters has little or no significance. He went along the road towards home and was on his way in the first two encounters between Odbur and Willett. At the third encounter he returned with Cozad and Nelson, who went back for the avowed purpose of seeing a fair fight. Instead of encouraging Odbur to renew the fight after the second encounter, the evidence indicates that Odbur had not decided to renew it until he met Nelson and Cozad, and asked them to go back with him and see a fair fight. It might even be inferred from the situation there that those two encouraged him. Cozad's middle name was ''Fight;'' he wanted to see it out. Shade said nothing at that time. The Attorney-General points out that some witness testified to having heard his voice in which he said, ''Where is the long-legged ——,'' indicating that he was hunting for Willett. Whether this was after the second encounter, or after it was all over, is not clear from the testimony. That remark does not indicate a purpose to hunt Willett down, and the use of the expletive appeared to go naturally into the language of those river bottom people. One cannot be charged with aiding and abetting merely by expressing enmity against the person who was the victim of the crime.

Again, the Attorney-General points to the fact that Shade fled. The evidence seems to be quite conclusive that he ran away because he was afraid of the mob which he heard was gathering. Later when the two were arrested in another State, Shade remarked that he was glad to go back, that he was tired of running away. While his absconding was a circumstance which might go to the jury in support of a charge of guilt, so far as we know, it has never been held sufficient of itself to make a submissible case.

It is further said that Shade held Odbur's horse during the second encounter, and that he hitched Odbur's horse with his own preparatory to the third encounter.

As to the second encounter, the matter is related by Flossie Blansett in this way: She saw Henry strike at Ernest with a knife; Ernest dodged and ran off the levee. Then this question was asked:

''Q. What did Henry and Fred Shade do then? A. Fred jumped and grabbed Henry's horse and Henry ran afoot after him, and then they ran on horseback—

''Q. Did Henry then get on his horse? A. Yes sir.

''Q. Who was holding Henry's horse during that time? A. Well, I couldn't say.''

From other descriptions of the fight it is evident that nobody was holding his horse while the encounter was going on, and from this it is apparent that, after Odbur started in pursuit Shade grabbed his horse, probably to keep it from straying away. That is very far from saying that he held his horse in order to aid Odbur in going into the fight.

After the second encounter, according to George Shade, Odbur called to Shade to bring his horse down, from fifty yards away, and Shade took the horse down to him. The evidence shows that Shade was on his horse all the time during the fight.

At the third encounter, Gozad said they met Willett walking up the levee, and Henry called to him to wait a minute, he wanted to see him, and went down off the levee to the fence where the fight occurred. Then the two of them picked up Odbur, took him to his horse, and Shade was holding the horses.

There is nothing to show that Shade held the horses for the purpose of enabling Odbur to make an attack upon Willett, Shade himself testified that he got off his horse; that after Henry jumped off and went to meet Willett, then Shade tied both horses to the fences. In that his testimony is in conflict with Cozad who said Shade was holding the horses when he brought the senseless Odbur back to put him on his horse.

There is nothing in this to indicate that Shade held them *for the purpose* of enabling Odbur to make the assault. Odbur dismounted and went after Willett, abandoning his horse. He did not need anybody to hold it for him in assaulting Willett. All this evidence indicates only that Shade looked after Odbur's horse to keep it from running away after he had dismounted and left it. That is not aiding or abetting in the assault.

Another difficulty for the State in seeking to hold Shade, as aiding and abetting, arises in that there is nothing in the world to indicate that Shade had any knowledge of Odbur's intention further than to engage in a fist fight. There is not a word to show that he knew Odbur had a knife, or intended to use one. On the contrary, at the second encounter when, according to George Shade, Odbur said, "Ernest you invited me up here to fight," and Ernest said, "Yes, Henry, I did, a fair fist fight." The girls present said that Odbur struck at Willett with a knife; none of the other witnesses saw that, and there is nothing to show that Shade saw it. He sat on his horse all the time, in the road. Then when they came up with Cozad and Nelson, Odbur said he was going back to whip Willett if they would go back and see a fair fight. All this indicates that so far as Shade knew anything about it, Odbur's intention was to have a fair fist fight.

The rule in such case is this: "If two combine to fight a third with fists, and death accidentally results from the blow inflicted by one,

the other also is responsible for the homicide. But if one resorts to a deadly weapon without the other's knowledge or consent, he only is thus liable.'' [State v. Darling, 216 Mo. 1. c. 461; State v. Porter, 276 Mo. 1. c. 394.] The quotation is from Bishop on Criminal Law, quoted and approved in the Darling case, and referred to in the Porter case. That would exonerate Shade, even if he aided Odbur.

But there is nothing to show that Shade even encouraged Odbur in his fight. It was Odbur's fight all through. After the second encounter it appeared that he had given up seeking further trouble with Willett, until they met Cozad and Nelson, and from the encouragement of their presence he went back with them. Naturally Shade went along. He was no more aiding and abetting at that time than Cozad and Nelson were. All of them went along for the purpose of seeing a fair fight. The evidence is entirely insufficient to authorize a conviction of Shade for murder in the second degree. There is nothing in the evidence indicating that he intended any fatal consequences to Willett at any time, or that he encouraged or aided Odbur in any purpose to inflict any serious injury upon Willett.

The judgment as to Odbur is affirmed, and. as to Shade it is reversed and remanded. All concur.