THE STATE v. WILKINS TAYLOR, Appellant.—8 S. W. (2d) 29.

Division Two, June 21, 1928.

*Grayston & Grayston, Howard Gray, Norman A. Cox* and *Hugh Dabbs* for appellant.

*Frank R. Birkhead,* Special Prosecutor, for respondent.

HENWOOD, C.—An information was filed in the Circuit Court of Jasper County by which Wilkins Taylor (appellant) and Overton H. Gentry, Jr., were jointly charged with the crime of rape. A severance was granted, and Taylor's first trial resulted in a failure of the jury to agree upon a verdict. Upon a second trial, the jury found him guilty and assessed his punishment at imprisonment in the penitentiary for twenty-five years. From the judgment and sentence based on the verdict, he has perfected this appeal.

The evidence in this case, in all essentials, is substantially the same as that in the companion case of State v. Gentry, ante, page 389, 8 S. W. (2d) 20, decided at this term. The interested reader may refer to the Gentry case for a detailed statement of the testimony of the numerous witnesses in the case.

Briefly summarized, the evidence offered by the State tends to show that, at the time in question, Bertha Goen, the prosecutrix, was eighteen years of age, and employed as a domestic servant in the home of Mrs. Walter Jackson in the city of Joplin. On January 5, 1927, between 6:30 and seven o'clock in the evening, she was stopped on the street in Joplin and introduced to the defendant and Gentry by her friend, Thelma Gishner, and persuaded to take a ride in the defendant's Buick sedan automobile. Her friend, Thelma Gishner, left her in the company of the defendant and Gentry with the promise that she (Thelma Gishner) would return for the ride after she changed her dress. She was invited to get in the car, and after some hesitation, Gentry got out and "kinda shoved her toward the car," and she sat down on the front seat of the car, between the defendant and Gentry, without further resistance on her part or further persuasion on their part. The defendant, who was driving, started the car and told her they would take a ride and return for Thelma Gishner. She and the defendant and Gentry were the only persons in the car. She asked them to drive to the Jackson home, in order that she might tell Mrs. Jackson she would not be home for awhile. They said they would do this, and, when they failed to do so, she tried to get out of the car, but made no outcry, though the streets were lighted and many people were passing along the sidewalks. Gentry held her down in the front part of the car and had his hand over her mouth. She did not scream before that because she was not "afraid of" Gentry, and did not try to scream after that. They drove to a cabin, about five miles north of Joplin and about a block and a half off of the public road. When the defendant started to carry her into the cabin, she "screamed and fought and was trying to get away and Gentry had to help him." They took her through

the living room of the cabin and into the bedroom, took her clothes off and put them in the living room, and put her on the bed. First, Gentry and then the defendant assaulted her, and between that time and two or three o'clock in the morning, Gentry had sexual intercourse with her "between twelve and fifteen times," and the defendant "from four to seven times." She said it was against her will and that she resisted as much as she possibly could. They also forced her to submit to acts of sodomy, and, when she resisted, they struck her and bruised her on her head and shoulder, and the defendant burned her on her neck or chest with a lighted cigarette. She exhibited a scar from a burn on her neck or chest while so testifying. They left her alone at two or three o'clock in the morning, and did not disturb her again until two or three o'clock in the following afternoon, when they gave her her clothes and said they would take her back to town. In the meantime, she heard music coming from the living room "for awhile," but did not know whether or not they remained at the cabin during all of that time. She tried to get out of the bedroom, but was unable to do so. She had nothing to eat and smoked no cigarettes while at the cabin. She rode back to town in the front seat of the car, between the defendant and Gentry, because she thought she "might as well ride," and made no complaint of their treatment of her until they let her out of the car in front of "Robertson's Apartments." Then, she told them she "was going to have something done about it," and they said "it wouldn't do any good because they had plenty of money." She reported her experience to her sister immediately, and to the colored servant at the Jackson home that evening. The physician (Dr. James), who examined her three days later, said she was in a nervous condition, and that he found bruises on her head and shoulder, a burn on her chest, soreness in her lower abdomen, a discharge from her vagina, and the lips of her vulva badly swollen; that the swollen and irritated condition of her private parts could have been caused by excessive sexual intercourse, with or without force; that either the prosecutrix or her sister in her presence told him that the prosecutrix was sixteen years of age. She remained in the Jackson home for ten days after this occurrence, and was then sent to a hospital and kept there for several days under observation for appendicitis. Upon leaving the hospital, she went to the home of the sheriff (Mr. Guy Humes) and continued to stay there until shortly before the first trial of this defendant. When her attention was directed to her dress, at the trial, she pointed out two or three torn places, which she said were caused by the defendant and Gentry in taking it off at the cabin. She admitted that, previous to this affair, she forged two checks on a bank in Pierce City, her former home, in the total sum of $175, and that she spent the greater part of the money for

clothes and a watch and a ring. She also admitted that, while in St. Louis in the fall of 1925, looking for employment, she fainted on the street and was kept under observation at the "Detention Home" for more than a week; and that she gave her name as "Beatrice Gowin" and made other false statements concerning her home and parents to the officers of that institution, because she was afraid they would send her to the "pest house" at Chillicothe if she told them she had run away from home.

The defendant testified that he was forty-nine years old, was engaged in looking after the leasing of his mother's mining lands and other real estate, and lived with his mother in Joplin. On the evening of January 5, 1927, between 6:30 and seven o'clock, he and Gentry and Roy Rice were standing on the sidewalk in front of the West Side Pharmacy, and his Buick sedan was parked nearby. Bertha Goen, the prosecutrix, came along, smiled at Gentry and hesitated, and Gentry "walked up and introduced himself," talked to her awhile, then introduced her to him (the defendant) and Rice, and all of them got in the car. When introduced, Rice said he knew Miss Goen. They drove around town for awhile, with Bertha in the front seat, between the defendant and Gentry, and Rice in the back seat of the car, and later, they "picked up" Carl Rakestraw at the Fourth Street Drug Store. Rice and Rakestraw had engagements to attend a picture show with Miss Velma Deardorff and Miss Ella Smith. After they had driven to the homes of Miss Deardorff and Miss Smith and these young ladies had joined the party, Bertha suggested a girl for the defendant, and she and Gentry got out of the car at this girl's home and were told that the girl was not at home. He then drove to his cabin on his mother's farm, north of Joplin. On the way to the cabin Bertha sat on Gentry's lap, put her arms around his neck, petted him, and called him her "sweet daddy." When they reached the cabin, about 8:30, Bertha followed Gentry into the cabin, and then she and Gentry "disappeared" in the bedroom and did not come out. He went in the bedroom twice; the first time, he observed Gentry and Bertha "standing there naked in each other's arms right by the bed;" the second time; they were in bed and having sexual intercourse. The other members of the party remained in the living room for about thirty minutes, trying the radio and playing the victrola, and then Miss Deardorff and Miss Smith became indignant because of the disappearance of Gentry and Bertha and asked to be taken home. All of them drove back to town, except Gentry and Bertha; "they said they wasn't ready to go home." Rakestraw got out of the car with Miss Smith at her home, about 9:30, and, after they took Miss Deardorff home, he and Rice went to a restaurant to get something to eat. He went home and went to bed shortly after midnight, but got up and returned to the

cabin between three and four o'clock the following morning. Gentry and Bertha were in bed and they asked him to "crawl in" with them. He took a nap for awhile in the living room, and then got in bed with Gentry and Bertha. When Bertha "got up she was stripped stark naked and she walked over and got a basin and got a bichloride tablet, showed us what she used, and she squatted down in that room and washed herself." Later in the morning, Gentry took the car and drove to a store for some groceries; and, while Gentry was gone, he and Bertha had sexual intercourse, at his suggestion and without any hesitation or reluctance on her part. This was the only time he had intercourse with her, and he did not commit any "act against nature" with her, by force or otherwise, and Gentry did not do so in his presence. Bertha prepared the breakfast, which he and she and Gentry ate together, washed the dishes, cleaned the car, and assisted in cleaning the cabin. She walked about the grounds, watched and fed the fishes in the little stream nearby, and apparently enjoyed her visit at the cabin very much. She said she would get her sister or another girl for him (the defendant) and come back to the cabin that evening. He and Gentry and Bertha sat around the cabin and "smoked" until three o'clock in the afternoon, and then drove back to town. Before separating in town, they stopped at the West Side Pharmacy and each of them drank two "coca colas." He admitted that he and Gentry and Rice and Rakestraw drank some intoxicating liquor in the afternoon before starting on the trip to the cabin. And he also admitted that, "about twenty-five years ago," he was convicted on a charge of felonious assault and "got a year in jail and a fine" by way of punishment therefor.

The defendant was corroborated in many particulars by Miss Deardorff and Miss Smith and by the testimony given by Rice at the defendant's former trial, which was read in evidence. Both Rice and Rakestraw testified at the first trial, but neither of them was present at the second trial. Both Miss Deardorff and Miss Smith said that, after they got in the car, they drove to another house to get a girl for Taylor, but did not get her. They thought the trip to the cabin was for the purpose of getting a girl for Taylor and that they would return for the picture show. They were not sure about the date, but it was the only time they ever went to the cabin or ever rode in Taylor's car. They did not know the girl in the front seat and did not identify her at the trial, because it was dark in the car, and they were not introduced to her and did not get a good look at her face. Miss Deardorff said the girl sat on Gentry's lap, petted him, called him "sweet daddy," and hugged him. Miss Smith said she did not see all of the petting, but did observe that the girl had her arm around Gentry and was talking to him. Both of them said that the girl followed Gentry into the cabin, and that Gentry and the

girl "disappeared;" that they did not see either Gentry or the girl any more, and heard no outcries of any kind in the bedroom; and that, after sitting in the living room for a few minutes, they asked to be taken home, because of the conduct of Gentry and the girl. Rice, in his testimony given at the former trial, said that he knew Bertha Goen prior to this occasion, and that she frequently came to the West Side Pharmacy, where he was employed. On the after-noon of Wednesday, January 5, 1927, he had taken a ride with the defendant and Taylor, and, later that evening, he saw Gentry talking to Bertha in front of the drug store, and, when he came out of the drug store, she and Gentry were in the car. His testimony was to the same effect as that of the defendant and Miss Deardorff and Miss Smith as to the drive around town, as to the conduct of Gentry and Bertha in the car, and as to their disappearance at the cabin. He also said that, before leaving the cabin, he went into the bed-room, and saw Gentry and Bertha "stripped off in bed, having sexual intercourse."

The defendant was further corroborated, as to the date of this occurrence, by the parents of Miss Smith, who said that she (their daughter) had an engagement with Carl Rakestraw on the evening of January 5th; and by Everett Appling, employed by the Frank-Seivers Undertaking Company, across the street from the West Side Pharmacy, who said that he saw Gentry and the girl get in the car on the evening of January 5th, and that he saw them again in a booth at the West Side Pharmacy on the following afternoon between three and four o'clock. And the defendant was further corroborated by his mother, who said he came home and went to bed "after twelve o'clock" on the night of January 5th, and had left home when she "got up" the next morning at seven o'clock.

Six witnesses from Pierce City and vicinity, five men and one woman, testified that the general reputation of Bertha Goen for "truth and virtue" and for "truth and morality" was bad. One of these witnesses, on cross-examination, said that, on one occasion, she and two boys stopped their car in front of his house and disturbed his sick wife by "swearing" and other boisterous conduct. Another of these witnesses, on re-direct examination, said it was reported in the community that she had sexual intercourse with a boy in a car on a public road "in broad daylight."

Miss Marion La Sater, "case worker" at the Girls' Protective Association in St. Louis, said that Bertha Goen came to her office in November, 1925, and, among other things, told her she was twenty-one years old, that her parents were dead, that she came to St. Louis from Kansas City, where she had worked "as P B X operator" in the Baltimore Hotel, that she had been in Chicago, that she had traveled in Europe as the companion of a wealthy woman, that she

was in London and Paris and visited for six months, at ''Castle Stronghold in Switzerland.''

In rebuttal, the prosecutrix denied that Rice and Rakestraw and Miss Deardorff and Miss Smith were in the car when she was taken to the cabin by the defendant and Gentry, and denied that she rode on Gentry's lap or petted him in any way. She further denied that she cooked breakfast, or ate anything at the cabin, or cleaned the cabin or the car, or took a walk or fed the fishes, or used any antiseptic tablets at the cabin. And she further denied that she said anything about going back to the cabin, with her sister or any one else, or that she drank any coca cola with the defendant or Gentry when they got back to town.

Six witnesses, five women and one man, testified that the defendant's general reputation for morality was bad.

I. It is seriously urged that the trial court erred in overruling the defendant's application for continuance. The application was based on two general grounds: first, the absence of material witnesses; second, the activities of the Anti-Horse Thief Association and other so-called protective associations in aiding the prosecution of this case and in threatening and otherwise attempting to intimidate the defendant's attorneys and other persons who might be interested in his side of the case.

(a) The application shows on its face that, on June 20, 1927, the day originally set for the trial of this case, the court, though denying the defendant's application for a continuance at that time, reset the case for trial on July 18th, in order to give the defendant additional time within which to procure the attendance of his absent witnesses or to take their depositions. Inasmuch as nothing was accomplished along this line during this period of twenty-eight days, the court may have concluded that a further postponement of the trial would meet with no better results. The testimony of the witnesses Roy Rice and Carl Rakestraw was largely cumulative in character, and both had testified at the former trial of this defendant. Moreover, the court granted the defendant's request to read in evidence the testimony given by these witnesses at the former trial, and the defendant exercised the option of so using Rice's testimony and of omitting Rakestraw's testimony. The trial judge did not abuse his discretion in this particular; nor was the defendant prejudiced by his ruling. [State v. Van Valkenburgh (Mo.), 285 S. W. 978.] The alleged evidence of the other absent witnesses related solely to previous acts of sexual intercourse in which the prosecutrix indulged willingly. Such evidence was incompetent for any purpose, and, therefore, the defendant lost nothing by the absence of such witnesses. Want of chastity cannot be shown except

by general reputation, and then only on the issue of consent. [33 Cyc. 1478.] Nor can the character of a witness be impeached by specific acts of immorality. [State v. Guye (Mo.), 252 S. W. l. c. 960; State v. Harmon (Mo.), 296 S. W. l. c. 399; 28 R. C. L. 623.]

(b) It must be conceded that the alleged activities of local organizations, in carrying on a campaign of publicity unfavorable to the defendant, in attempting to intimidate his attorneys and witnesses, and in planning to have their members attend his trial in large bodies and as representatives of such organizations, were likely to endanger the defendant's right to a fair and impartial trial; yet, the trial judge could hardly assume that such organizations would disband, or that the feeling of prejudice so aroused against the defendant would subside within a few months, when his court would convene again for its next regular term, or even within a much longer period of time. And while he might have been fully warranted in granting a continuance on this ground (Sec. 3996, R. S. 1919), as some of the incidents of the trial seem to indicate, we do not feel justified in holding that he acted unwisely or arbitrarily in failing to do so. An application for a continuance is addressed to the sound discretion of the trial court, and an appellate court will not interfere, unless it clearly appears that such discretion has been abused. [State v. Van Valkenburgh, supra; State v. Williams (Mo.), 263 S. W. 198; State v. Wilson (Mo.), 242 S. W. 886.] The court committed no error in refusing to hear oral testimony in support of the application. The proper and approved method of supporting and of opposing applications for a continuance is by affidavits and counter-affidavits. [Sec. 3997, R. S. 1919; State v. Hesterly, 182 Mo. 16, 81 S. W. 624.] It may be well to note here that the charges of local prejudice contained in this application for a continuance would have been more appropriate in an application for a change of venue. [Sec. 3973, Laws 1921, p. 206.]

II. Numerous errors are assigned as to the admission and exclusion of evidence, but we find no merit in these assignments.

(a) The testimony of the prosecutrix and that of her corroborating witnesses, as to complaints made by her concerning her ravishment by the defendant and Gentry, was properly admitted. According to the story of the prosecutrix, she complained to her sister immediately upon her release from her so-called captors, and to the colored servant in the Jackson home only a few hours later. Evidence of prompt complaint is always admissible, in a rape case, as an element of corroboration. [Kelley's Crim. Law (3 Ed.) 541; State v. Lawhorn, 250 Mo. 293,

307, 157 S. W. 344.] The question of promptness must be considered in connection with the other facts and circumstances in each particular case. [State v. Bigley (Mo.), 247 S. W. 1. c. 171.]

(b) It was proper, also, to admit the testimony of the prosecutrix relating to the acts of sodomy committed by the defendant and Gentry. These acts, though constituting another crime, were committed at the same time and place as the sexual acts in question, and were, therefore, clearly admissible as a part of the res gestae. [State v. Harrison, 263 Mo. 642, 658, 174 S. W. 57.]

(c) The court followed the ·well-established rule in permitting the State to offer proof as to the defendant's bad reputation for morality, after he had taken the stand and testified in his own behalf. His credibility, like that of any other witness, may be attacked by proof of that character. [State v. Hodges (Mo.), 295 S. W. 1. c. 787, and cases cited.]

(d) The testimony of the deputy sheriff, as to the locks on the gate and the cabin and as to the manner in which the doors and windows of the cabin were constructed and fastened, related to matters testified to by the prosecutrix, and was admissible as corroborative of her story in some particulars.

(e) No error was committed by the court in excluding the defendant's offer to put in evidence the information and the record of the prosecution pending against him on the charge of sodomy. Such information and record were not admissible for any purpose in this case. Moreover, such offer of·proof was inconsistent with the defendant's motion to strike out the evidence relating to such acts of sodomy, which was made at the same time and in connection therewith.

(f) Other assignments of error as to the evidence, admitted and excluded, and as to the cross-examination of the defendant and his witnesses, are general in character and do not specify the matters complained of. Such assignments are not reviewable on appeal. [Laws 1925, p. 198; State v. Murrell, 289 S. W. 859.]

III. The question of the sufficiency of the evidence in this case has been a matter of serious concern to the writer of this opinion. The defendant's admission that he had sexual intercourse with the prosecutrix left nothing for determination except the issue of her consent or lack of consent to such intercourse. On this issue, her own story leaves much room for doubt. Her own admissions and other proof concerning her previous conduct furnish additional rea-

sons for doubt. Her story, as to what happened at the cabin and on the way to the cabin, cannot be reconciled with the testimony of several disinterested and unimpeached witnesses. On the other hand, she was corroborated to some extent by the torn places in her dress, by the bruises on her head and shoulder and the burned place on her chest, by the swollen and irritated condition of her private parts, and the evidence of her prompt complaint against this defendant and Gentry. If, under any reasonable view of all of the facts and circumstances developed at the trial, the story of the prosecutrix was worthy of belief, then a case was made for the jury and the evidence is sufficient to support their verdict. And, following the most recent rulings of this court, we feel constrained to so hold. [State v. Wade, 306 Mo. 457, 268 S. W. 52; State v. Cooper, 271 S. W. 471; State v. Atkins, 292 S. W. 422; State v. Preslar, 300 S. W. 687; State v. Pinkard, 300 S. W. 748; State v. Thomas, 1 S. W. (2d) 157.]

IV. The trial court is charged with error in the giving and refusal of various instructions.

(a) Instruction 4, in effect, told the jury that, in determining the guilt or innocence of the defendant, they could consider the acts of Gentry as the acts of the defendant, if they found that the defendant was "in company with" Gentry at the time of the alleged rape, without requiring the jury to find, in this or any other instruction, that the defendant and Gentry were, at the time in question, acting in concert and in furtherance of a common purpose and design. [Sec. 3687, R. S. 1919.] For the reason mentioned, this instruction was not only erroneous but prejudicial. (Same instruction is quoted in full in Gentry case.)

(b) By instruction 8, the jury was told that, if they found "the prosecuting witness made no outcry at the time the offense is alleged to have been committed, and did not, as soon as an opportunity afforded, complain of the offense to others, but concealed it for a considerable length of time thereafter," then the jury should consider such circumstances in connection "with all the other evidence, in determining the guilt or innocence of the defendant." This instruction was a correct declaration of the law on the subject-matter thereof and was appropriately given in this case.

(c) Instructions numbered 5, 7 and 9 are attacked in the defendant's brief, but the giving of these instructions is not complained of in his motion for a new trial; and, for that reason, they cannot be considered. [Laws 1925, p. 198; State v. Standifer, 289 S. W. 856.] (See Gentry case for discussion of same instructions.)

(d) The defendant's refused instructions numbered 15 and 16 declared, in effect, that the jury should not consider the fact that Miss Ella Smith and Miss Velma Deardorff were misled in making the trip to the cabin, or the fact that the defendant failed to protest against acts of indecency while they were at the cabin, in determining his guilt or innocence of the offense charged. The giving of these instructions would have injected into the case false issues on collateral matters, and they were, therefore, properly refused. Only general complaint is made as to the refusal of the defendant's Instruction 14. Under the present rule, this complaint must be disregarded. [Laws 1925, p. 198; State v. Standifer, 289 S. W. 856.]

V. The defendant very seriously complains of numerous remarks made by the prosecuting attorney in his closing argument to the jury, and of certain interruptions and demonstrations on the part of spectators at the trial. These complaints are well founded and must be sustained.

As to some of the remarks and other conduct complained of, the record reads as follows:

"MR. BIRKHEAD: . . . They have tried Bertha Goen, instead of Wilkins Taylor, *the moral pervert,* who sits over there.

"MR. GRAYSTON: We object to him calling him a moral pervert.

"(No ruling.)

"MR. GRAYSTON: Except to failure of the court to rule. . . .

"MR. BIRKHEAD: I have tried to make the womanhood of Jasper County safe so Wilkins Taylor, *the moral pervert,* or 'the old man,' as they call him, or *moral perverts like Wilkins Taylor and his slick friend, Overton Gentry,* maintaining the cabin out there, maintaining the cabin, Wilkins Taylor's cabin, equipped as his cabin was, not only with lipstick and powder puffs, equipped as it was for a summer home? No. *For Wilkins Taylor and his friends Overton Gentry and others like him, for the purpose of taking women there—*

"MR. GRAYSTON: Object to that. That is not what he is on trial for.

"THE COURT: Overruled.

"MR. GRAYSTON: Except. . . .

"MR. BIRKHEAD: Now, Mr. Grayston—

"MR. GRAYSTON: I say it and I mean it.

"MR. BIRKHEAD: I am going to argue this case.

"THE COURT: Make your objection.

"MR. GRAYSTON: I am not going to have you do that.

"MR. BIRKHEAD: I am going to argue this case.

*Voices in Audience: Take him out.*

"MR. GRAYSTON: I make my objection that the prosecuting attorney is trying deliberately to put over a falsehood by trying to indicate to this jury a false reason for not producing that statement.

"THE COURT: The prosecuting attorney is simply drawing an illustration.

"MR. GRAYSTON: He is not doing that, and we except and ask that be withdrawn.

"THE COURT: Overruled.

"MR. GRAYSTON: Except. . . .

"MR. BIRKHEAD: *I never heard of such a loathsome case. She tells you gentlemen Gentry is the same kind and stripe*—

"MR. GRAYSTON: Object to that as unfair and not warranted and contrary to the instructions of the court; that this defendant is not responsible for any act committed by Overton Gentry.

"THE COURT: He may comment on the testimony.

"MR. GRAYSTON: For the further reasons set up in our various motions to strike out the testimony as to acts of sodomy. Except to the ruling of the court. . . .

"MR. BIRKHEAD: You remember the defendant when he was on the stand testified that when, they claim Bertha Goen was out there that morning and was just working for them like a slave and cleaning the car and shining shoes and I don't know what else—*a regular slave for 'the old man' and his young, slick partner, Overton Gentry*—

"MR. GRAYSTON: Object to that statement, improper criticism of the parties.

"THE COURT: Overruled.

"MR. GRAYSTON: Except. . . .

"MR. BIRKHEAD: But, gentlemen, she was there taking care of the little children of Mrs. Walter Jackson, and the evidence shows it.

"MR. GRAYSTON: We object to that. That raises an important issue in this case. The prosecution has taken the position all through this case that we could not prove a bad reputation of Bertha Goen by specific acts. We say the converse is true and he cannot sustain her by specific acts.

"THE COURT: Oh, he is arguing about her being there to take care of the children.

"MR. GRAYSTON: We object to that and ask it to be withdrawn.

"(*Handclapping and laughter in the audience*).

"THE COURT: Mr. Sheriff, put those people out, or bring them up here and I will fine them.

"MR. GRAYSTON: This demonstration, in the presence of the court, shows partisanship consistent with other matters that have been brought to the attention of this court, and the record from beginning

to end shows this defendant cannot have a fair trial at this time, and we ask this jury be discharged and a mistrial declared.

"THE COURT: Proceed, Mr. Birkhead.

"MR. GRAYSTON: Except. . . .

"MR. BIRKHEAD: Finally, gentlemen, during that period of time and at divers times these two men resorted to *that detestable crime* against nature, *the crime* not to be mentioned amongst Christians, *the crime* which hardly even bears a name, it was so detestable.

"MR. GRAYSTON: Object because the record shows that is a separate charge.

"THE COURT: Go ahead.

"MR. GRAYSTON: Except. . . .

"MR. BIRKHEAD: He goes home about midnight and spends twenty minutes fixing the lights on his car, and under his own admission *he has turned his house over for the purpose of prostitution.*

"MR. GRAYSTON: Object. He is not being tried for that.

"THE COURT: Go ahead.

"MR. GRAYSTON: Except to the ruling of the court. . . .

"MR. BIRKHEAD: It is not enough to say it is Bertha Goen against this man; *it's not enough to say it is the State of Missouri against Wilkins Taylor. It is the public generally.* And I say to you gentlemen, in this case and every criminal case, particularly of this kind, the public has an interest in it to make life safe—

"MR. WALDEN: Except to that remark, that this is a prosecution by the public against Wilkins Taylor. We ask the court to tell the jury to disregard that and to reprimand the prosecuting attorney.

"THE COURT: It is according to what you consider the public. Overruled.

"MR. WALDEN: We except to that and except to the court's failure to rebuke counsel."

(All italics ours.)

We deem it unnecessary to discuss each of the objectionable remarks separately. It will suffice to say that each and all of the remarks of the prosecuting attorney above quoted, and especially the italicized portions thereof, were unwarranted, improper and highly prejudicial. In each instance, the court should have sustained the defendant's objection, reprimanded the prosecuting attorney, and admonished the jury to disregard such remarks; and the court committed error in failing to do so. The right of a prosecutor to argue his case vigorously and effectively should not be restricted, so long as he confines his argument to the record facts and legitimate inferences that may be drawn therefrom; but a prosecutor should never be permitted to apply unbecoming names and epithets to the defendant, or to refer to the defendant or his alleged accomplice as a

criminal of any class or kind. In this case, the prosecutor was permitted, without any restriction, to make and to repeat such references to the defendant and to Gentry, the man with whom he was jointly charged. The record shows that all of the defendant's objections to the remarks complained of were either overruled or ignored by the court. Indeed, the court's approval of this character of argument, as expressed in its rulings and comments thereon, must have added to the prejudicial effect of such argument on the jury. The record further shows that one of the objections made by defendant's counsel to the prosecuting attorney's remarks was followed by "Voices in Audience," spectators, saying: "Take him out." Shortly thereafter, when the court commented approvingly on certain remarks of the prosecuting attorney, which were objected to by the defendant's counsel, there was "handclapping and laughter in the audience." The first expressions by members of the audience of their prejudicial feelings against the defendant and his counsel met with no reprimand from the court; nor did the court warn the audience against a repetition of such improper conduct. When members of the audience again manifested their interest in the prosecution and their feelings against the defendant by handclapping and laughter, the court ordered the sheriff to "put those people out" or to bring them before the court for punishment, but the record fails to show that this order was executed, or that any further action was taken by the court or the sheriff. No demonstrations, of any kind, on the part of spectators, should ever be tolerated in a court of justice, and such demonstrations should always and under all circumstances meet with a stern rebuke from the court. At that state of the trial, however, when the case was about to be submitted to the jury, it is doubtful whether the court, by any rebuke addressed to the audience or by any admonition addressed to the jury, could have cured the harmful effect of these incidents. The remark of the prosecuting attorney that, in a prosecution of this kind, "the public" has an interest in addition to that of the "State of Missouri" was also improper. What was meant by this so-called distinction between the public and the State is not clear, but it may have been interpreted by the jury as some justification for the conduct of the citizens who interfered with an orderly administration of the law by openly manifesting their interest in this case at the trial.

From the disclosures of this record, that is, the error in Instruction 4, the inflammatory remarks of the prosecuting attorney, and the prejudicial atmosphere of the court room caused by spectators during the closing hour of the trial, we are thoroughly convinced that the defendant was not accorded a fair and impartial trial. A conviction so obtained is no triumph for justice and does not tend to uphold the majesty of the law. [State v. Guerringer, 265 Mo. 408,

178 S. W. 65; State v. Wellman, 253 Mo. 302, 161 S. W. 795; State v. Davis (Mo.), 190 S. W. 297; State v. Connor (Mo.), 252 S. W. 713.] "Surely it is better that justice travel with leaden foot, rather than that she walk rough-shod over the constitutional rights of citizens to be equal one with another before the law." [State v. Guerringer, supra.]

For the reasons indicated, the judgment is reversed, and the cause remanded. *Higbee* and *Davis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. *White, P. J.,* concurs; *Walker, J.,* concurs in the result on the ground of errors accruing during the trial necessitating a reversal and a remanding; *Blair, J.,* not sitting.