THE STATE v. HENRY PIPPIN, Appellant.—36 S. W. (2d) 914.

Division Two, March 25, 1931.

*Barton & Moberly* for appellant.

*Stratton Shartel,* Attorney-General, and *Don Purteet,* Assistant Attorney-General, for respondent.

HENWOOD, J.—Henry Pippin and Jason McElrath were jointly charged, in the Circuit Court of Oregon County, with robbery in the first degree. A severance was granted, and the State elected to try Pippin first. The jury found him guilty and assessed his punishment at imprisonment in the penitentiary for five years. He was sentenced in accordance with the verdict, and, in due course, appealed.

The pertinent evidence is fairly stated, in substance, in the Attorney-General's brief. This statement of the evidence (allowing for some alterations) is as follows:

"The prosecuting witness, Lora Courtwright, lived with her father, mother and brother, in Cedar Bluff Township, Oregon County, Missouri. A few days before the 7th day of February, 1929, Lloyd Courtwright, her brother, employed defendant to haul a load of cotton to market at Maynard, Arkansas. He was to use his own team and wagon. Between four and five o'clock in the morning of February 7, 1929, he and Miss Courtwright left the latter's home with the cotton loaded in the wagon. The wagon was equipped with an ordinary spring seat. Maynard was twenty-two miles distant from Miss Courtwright's home. The roads were muddy, it being a misty,

rainy day, turning to snow later on in the evening. They arrived in Maynard between eleven and twelve o'clock of that day. On the trip, defendant, in conversing with Miss Courtwright, indicated that he wanted to buy some feed, but that he did not have any money, saying: 'I ain't got a red penny to my name.' Miss Courtwright informed him that he would probably have to make a note for the hay, whereupon defendant said: 'No, I will get the money.' After their arrival in Maynard, the defendant unloaded the cotton at the gin, and gave Miss Courtwright a slip or due bill for the amount of money the cotton sold for. They went to a bank, where she cashed the check or due bill for the cotton. While in the bank, Miss Court-wright paid defendant $4.75, for his services in hauling the load of cotton. When she left home that morning, she had in her possession $14 in cash. After having paid defendant for his services and having purchased a dress and some mule shoes and some other articles, she had somewhere in the neighborhood of $67, in her purse, in cash. Along about two o'clock in the afternoon, they started on the return journey to her home. While enroute defendant said: 'Your father puts a heap of confidence in me, don't he?' Whereupon she said: 'I don't know, how is that?' Defendant replied: 'Well, he trusted me down here with you, you having all that money on you; if you get home this time, you will never go with me again on a load of cotton.' Thereupon she wanted to know the reason why. Defendant replied: 'Well, you just wait.' She then said: 'I won't care if I never see you again or not.' As they drove along, defendant would stop and rest his horses, from time to time, saying that one of them was sick. At another time, he said that he believed they were off the road. Defendant, upon being requested to see whether he was on the right road or not, passed the incident off by laughing. About eight or nine o'clock that night, as they were driving along the road, it commenced snowing. As they passed a little store alongside the road, the door opened and the proprietor asked: 'What did you get for your cotton?' Defendant replied in loud voice: 'Let her snow.' McElrath was a brother-in-law of the proprietor of the little store, and stayed in the store when not working out for someone else. She did not see McElrath when the door opened, as they passed the store. Her home was a little over a quarter of a mile from the store. Driving on a little more than one hundred feet from the store, she saw two men standing near a hickory tree, which was alongside the road. As they were going by the hickory tree, one of the men stepped out and grabbed the horses. The other man, the larger of the two, climbed into the wagon, over the top of the front wheel, and said: 'Hands up, and hand over your money.' Defendant said: 'What does all this mean?' The man who climbed into the wagon had a rag in his hand, which he put over Miss Courtwright's head and mouth. He then jerked

her back over the spring seat, where he held her, and commenced cursing and asking for the money. She called to defendant to help her. Defendant thereupon replied: 'This is not done yet, I tell you; I know one of you men.' The man who was holding Miss Courtwright said to the man who was holding the team: 'You get back in here and get this money off the girl while I am holding her.' During the scuffle she dropped her purse, which contained $67. The man who was holding the team got back in the wagon, struck matches and found the purse, whereupon both men jumped out of the wagon and ran away. During the struggle, Miss Courtwright bit one of the men, somewhere on the hand. Defendant did not make any effort to prevent the robbery. Miss Courtwright did not, at any time, see a gun in the hands of the men. She testified that one of the men said to the other: 'Have you got my gun?' The other said: 'No, I have got my gun in my pocket.' When they got to defendant's house, which was about two hundred yards from the scene of the robbery, defendant told his wife that the robbers took $1.25 away from him. On the road, prior to the robbery, defendant told Miss Courtwright that he had bought a new pair of shoes, overalls, and a roll of kodak films, with the money which she had paid him, saying: 'Yes, I spent all but a pitiful little nickel.' Shortly after the robbery, Miss Courtwright found an old cap in the bed of the wagon up near the spring seat, in front. At the time of the robbery, she could not tell who the robbers were. The one who climbed in over the wagon wheel was dressed in dark clothes, rather tall, a young looking man, and had on a cap. She heard this man speak at the time of the robbery, but did not recognize his voice at that time. On the second day of April, 1929, she attended a school meeting. The business of nominating and electing a school director was going on, and a certain man was nominated. McElrath was sitting immediately in front of Miss Courtwright. He spoke up and said: 'I third the nomination, as he is already a director and a pretty high man.' She recognized his voice as the voice of the man that had gotten into the wagon and taken hold of her during the robbery. She testified that, since the robbery, she had seen McElrath, and, in addition to noticing his voice, had noted his size and maneuvers, and that he filled the description exactly of the man who had hold of her during the robbery. She further testified that she was slightly acquainted with one Boyd Dixon, and that, since the robbery, she had met him on the road where his car was stuck in a mudhole. Dixon was talking about his car to her, and she recognized his voice as the man who had asked, during the robbery: 'Have you got my gun?' This man was the one who had grabbed and held the team. After the robbery occurred, and she and defendant had gone to the latter's house, defendant told her brother that they couldn't do anything about the robbery unless they knew for sure who did it. That night, she heard defend-

ant's wife talking to him. His wife said: 'Henry, did they hurt you any?' Henry replied: 'Nothing only they hurt my hand.' Defendant's hand was bleeding at the time. A few days after this, Miss Courtwright saw defendant in the prosecuting attorney's office, and his hand looked like a little nick of flesh was out of it. She did not know whose hand she had bitten during the progress of the robbery, but did know that she had bitten someone's hand. The man who first got in the wagon was larger than the man who was holding the horses. He was heavier built. She thought she had bitten the hand of the larger man. The rags which the robbers used to put over her eyes and in her mouth were linings out of coat sleeves. The one which was used as a gag caused her mouth to bleed. She left these rags and the cap in defendant's wagon. After she had gotten to her home, about a quarter of a mile from defendant's house, her younger brother returned to the latter's house and got the cap, but did not get the rags. On the following morning, defendant told her his wife had burned these rags up. The cap was kept at her home until the time of trial. This cap was shown to have been the cap which McElrath had been wearing shortly before the time of the robbery. It was also shown to have been in the possession of Boyd Dixon sometime prior to the robbery. On the night of the robbery, Miss Courtwright's brother, when at defendant's house, for the purpose of getting the cap, saw that defendant had a little skinned place on his hand. It was bleeding, but he could not tell whether there were teeth marks on it. On the day before the robbery, defendant and McElrath were seen together, going to a public sale; also, at the sale. They were not seen to leave the sale together. Miss Courtwright said, shortly after the robbery and at the preliminary hearing, she could not recognize or identify the robbers at the time of the robbery. She did not know whether defendant took part in the robbery. She did not see him with a gun, nor did she see him attempt to drive the robbers off. She thought he was standing up in the front end of the wagon bed while she was being robbed. She did not know whether he got any part of the money. The robbery occurred in Cedar Bluff Township, Oregon County, Missouri.

"Defendant, testifying in his own behalf, disclaimed any participation in, and any connection with, the robbery, and said he did not know who committed the robbery. He also said that, when the man climbed up on the side of the wagon and told him 'to stick them up,' he 'tried to start the horses,' and then the man got into the wagon, and 'pushed' him with a gun, and told him 'to stick them up,' which he did; that this man 'went through' his pockets and took 'a dollar and something' from his pockets; that this man held a gun on him while the other man searched and robbed Miss Courtwright; and that he did not see any one blindfold or gag her. He

further testified that he scratched his hand while hanging up his harness in his barn that night.''

Counsel for the defendant contend, and the Attorney-General concedes, and we agree, that there is no substantial evidence to support the verdict.

For the purposes of this opinion, the evidence may be taken as sufficient to warrant the finding that McElrath and Dixon were the two men who actually committed the robbery in question, but it does not warrant the finding that the defendant participated in the conspiracy to commit the robbery, or that he aided or abetted in the commission of the robbery. [State v. Larkin and Harris, 250 Mo. 218, 157 S. W. 600; State v. Odbur and Shade, 317 Mo. 372, 295 S. W. 734.] At the trial, the State relied on the evidence that the defendant and McElrath were seen together at a public sale the day before the robbery; that the defendant told the prosecuting witness, on their homeward journey from Maynard, sometime before they reached the place of the robbery, if she got home from that trip, she would never go with him on another trip; that, in her struggle with the robbers, she ''bit one'' of them on the hand; and that one of the defendant's hands was bleeding when they reached his home, shortly after the robbery. This evidence merely raises a suspicion of the defendant's guilt, and, as we have said in numerous cases, a verdict based upon suspicion will not be permitted to stand. [State v. Jones, 106 Mo. 302, 17 S. W. 366; State v. Perkins, 18 S. W. (2d) 6; State v. Matticker, 22 S. W. (2d) 647; State v. McMurphy, 25 S. W. (2d) 79; State v. Nagle, 32 S. W. (2d) 596.] Moreover, the testimony of the prosecuting witness, as to what the defendant said at the time of the robbery, tends to show that he attempted to prevent the robbery, or, at least, to dissuade the robbers from carrying out their intention to commit the robbery. According to her testimony, when the robber who first climbed into the wagon commanded her and the defendant to put up their hands and to hand over their money, the defendant said: ''What does all this mean?'' And, during the progress of the robbery, the defendant said: ''This is not done yet, I tell you; I know one of you men.'' And she further testified that she thought the defendant was standing in the front end of the wagon during the progress of the robbery; and that she thought she bit the hand of the robber who first climbed into the wagon.

The other complaints of the defendant relate to matters which are not likely to occur at another trial of the case, and, therefore, need not be considered.

Because of the insufficiency of the evidence, the judgment is reversed and the cause remanded. All concur.