STATE of Missouri, Respondent,

v.

John Wayne GRIGGS, Appellant.

No. 53948.

Supreme Court of Missouri,
Division No. 2.

Oct. 13, 1969.

John C. Danforth, Atty. Gen., Gene E. Voigts, First Asst. Atty. Gen., Jefferson City, for respondent.

Lane Harlan, Boonville, for defendant-appellant.

J. R. Fritz, Sedalia, for defendant-appellant.

FINCH, Judge.

Defendant was prosecuted under the Second Offender's Act on a charge of robbery with a dangerous and deadly weapon. He was convicted by the jury and the judge fixed his punishment at twenty years imprisonment, after which he appealed. We affirm.

The sufficiency of the evidence to sustain the conviction is questioned. In determining this issue, we accept as true all the evidence in the record tending to show defendant's guilt, whether circumstantial or direct in nature, together with all favorable inferences reasonably drawn therefrom, and we disregard the evidence and inferences to the contrary. State v. Webb, Mo., 423 S.W.2d 795; State v. Sykes, Mo., 436 S.W.2d 32.

On July 13, 1967, Julius Fuqua, Larry Coleman, William Jones, and defendant Griggs met at a pool hall in Columbia. Something was mentioned about pulling a job. Subsequently, they spent some time at a cocktail lounge, after which Coleman borrowed a white Oldsmobile convertible from a girl friend and the four then drove

to Boonville. Fuqua and Coleman suggested that they rob a small grocery store in Lone Elm, a nearby small community. They bought some vodka and soda at Boonville and then proceeded on to Lone Elm. They drove by the store, made a "U" turn and then stopped in front of the store. Coleman was driving, and Jones, at the suggestion of Fuqua, was lying down in the back seat so that anyone noticing the car would observe only three people.

Fuqua and Griggs put silk stockings over their heads and then went up on the porch of the store. Fuqua rattled the door, causing the owner, Niubruegge, to come and open it. Fuqua entered the store and grabbed the owner. He also fired a gun which he was holding in his hand. Fuqua then placed the gun at Niubruegge's head, saying, "I want your money." They walked to the back of the store to the vault where Fuqua was handed a cigar box containing the owner's money.

Defendant Griggs had entered the store behind Fuqua. At Fuqua's direction, he went to the wall on the side of the store where he jerked the telephone off the wall, taking the receiver with him when he and Fuqua left.

Meanwhile, a Mr. Baker who lived on the other side of the street started to go to the store for some ice cream. As he looked across the street, he saw a white Oldsmobile convertible in front of the store and observed two men on the store porch. He watched the storekeeper open the door and the front man then enter and grab him. He also heard a shot fired. Baker told his wife to call the police and ran out of the house to get the license number of the car. However, when he observed a man sitting in the driver's seat, he turned around and went back to his house to make sure that his wife had called the police. Meanwhile, Coleman, in the driver's seat, had observed Baker's actions and he honked the car horn at the people in the store. Shortly, they came out and reentered the car and it drove off at a fast pace.

At about that time, a Mr. Joe Davis drove up and heard Mr. Niubruegge calling out that he had been robbed. Davis asked Baker if the car which had just driven off was the one involved, and on being informed that it was, he then set out in pursuit of that car. He could see its taillights except when there was a dip in the road. At a "T" intersection of Highways J and B, Davis found that the Oldsmobile convertible had failed to make the turn and had ended up in the ditch. Shortly thereafter, the sheriff and a highway patrolman arrived. Coleman was the only person in the Oldsmobile. He stated that the others had gotten away. Testimony of William Jones disclosed that they had climbed the fence and walked to a wooded area in which they had spent the night. The next day they started walking again and in the late afternoon the three of them were apprehended in fields in the vicinity of Prairie Home.

The storeowner was not asked at the trial to identify defendant as one of the men in the store when he was robbed. However, William Jones, one of the occupants of the Oldsmobile, testified for the state. He told of Fuqua and Griggs going into the store for the purpose of robbing the owner, and then coming out with Fuqua carrying the cigar box of money and Griggs holding the telephone receiver. Jones testified that shortly before the two went into the store, Griggs had said that he did not want to go ahead with the robbery but that when Fuqua stated he was going ahead anyway, Griggs then remarked that he might as well go on in with him. Both then put silk stockings over their heads and entered the store to rob it.

The evidence is sufficient to sustain the conviction. Defendant was positively identified as the man who went into the store with Fuqua on the mission of robbing the storeowner. The four men had discussed a robbery as they drove in the automobile and they had gone to the Lone Elm grocery for that purpose. Mr. Niubruegge testified that he was robbed at gunpoint and that the man accompanying the armed rob-

ber tore the telephone off the wall and took the receiver with him. When defendant Griggs came out of the store he was carrying that telephone receiver. Furthermore, Griggs fled in the car with the others and after the car was wrecked he fled on foot, eventually being captured in the company of Fuqua and Jones. The state also offered evidence of fingerprints of defendant, lifted from the outside of the window and vent of the door on the right-hand side of the Oldsmobile. There was substantial evidence to prove every element of the offense of which defendant was convicted.

Fuqua and Coleman, both serving sentences for this robbery after pleas of guilty, testified for the defendant. They stated that Griggs had passed out before the robbery and was asleep on the rear seat of the car. According to them, it was Jones, not Griggs, who accompanied Fuqua into the store. Furthermore, Fuqua testified that the purpose of the visit to the store was to buy more beer and that only as he entered the front door did he decide to rob the storeowner. However, it was for the jury to decide which of these conflicting stories to believe and which to disbelieve. Obviously, they believed the testimony of Jones and disbelieved the testimony of Fuqua and Coleman. It is true, as defendant points out, that Jones was an accomplice. However, the court properly instructed the jury with respect to the consideration of the testimony of an accomplice, and it was the jury's prerogative, under the facts in this case, to accept his testimony and to convict the defendant.

■ Defendant cites and relies on three cases in connection with his contention that a submissible case was not made. He first cites State v. Pippin, 327 Mo. 299, 36 S.W. 2d 914. However, a reading of that case shows that it involved a very different set of facts. That defendant drove a wagon in which the woman who was the victim of the robbery was a passenger. The wagon was held up by two men and the state sought to show that the driver had not re-

sisted the holdup and that he was in league with the robbers. The evidence was not sufficient for that purpose and the Attorney General agreed that there was insufficient evidence to sustain the verdict. In State v. Conway, 351 Mo. 126, 171 S.W.2d 677, a conviction of murder in the first degree was reversed because this court found no proof of deliberation or premeditation. It was the state's position that the homicide had occurred in the perpetration or attempted perpetration of a robbery, thereby making it murder in the first degree, but the opinion held that there was no evidence to show that the defendant had been attempting to perpetrate a robbery at the time of the shooting. That case has no application to the facts here. Finally, the defendant cites State v. Key, Mo., 411 S.W. 2d 100, in connection with a contention that the evidence shows that what the defendant Griggs did in tearing the telephone off the wall came after the robbery had been completed and hence that at most the defendant would be an accessory after the fact. Such a contention was overruled in the Key case. It is not authority for the proposition asserted by the defendant herein. There was ample evidence from which the jury could find that the defendant Griggs was a participant in the robbery. He was responsible for the acts of Fuqua, as well as his own. State v. Thompson, Mo., 299 S.W.2d 468 [17]. We overrule this contention.

Defendant next complains that the final argument on behalf of the state was prejudicially erroneous in that it asserted that defense witnesses had committed perjury. In the argument complained of the prosecuting attorney was talking about Fuqua and Coleman, the two participants in the robbery who had testified for the defendant. He commented on the fact that their cases had been closed and their punishment already had been assessed. He then said: "So, how does it hurt them to come up on this stand and testify for a friend, a buddy, and keep him out of the prison? For what purpose they keep him out, I do not know. But this also gives them a chance to get

what you might call a little left-handed revenge against Billy Jones. It gives them a chance to laugh at the law, to snub their nose at the law, because they will get a man off—they hope to—by their testimony, by their perjured testimony."

Counsel objected at that point, but the court overruled the objection, saying that this was argument.

Defendant cites the cases of State v. Schneiders, 259 Mo. 319, 168 S.W. 604, and State v. Taylor, 320 Mo. 417, 8 S.W.2d 29. Both of those cases involved extreme use of personal invectives against the defendant by the prosecuting attorney in his closing argument. The incidents there involved are not at all comparable to what occurred here.

 There was sufficient evidence in this case from which the prosecuting attorney could infer that the two witnesses in question were lying. The prosecuting attorney had a right to comment on the conflicting testimony and the credibility of defendant's witnesses and the truth or falsity, from the state's point of view, of their testimony. State v. Poucher, Mo.App., 303 S.W.2d 197; State v. Harris, Mo., 351 S.W.2d 713. The trial court did not err in overruling the objection to this argument.

Finally, defendant asserts that since § 560.135, V.A.M.S., under which he was prosecuted, provides for punishment of death or imprisonment, he was entitled under § 546.180, V.A.M.S., to twelve peremptory challenges and the state to six, thereby necessitating a venire of thirty instead of the twenty-four provided.

The transcript on appeal discloses that when court convened for the trial the prosecuting attorney stated into the record that the state was waiving the death penalty. The judge then stated that the jury panel would consist of twenty-four, with the state having four peremptory challenges and the defendant eight. Counsel for both the defendant and the state concurred, but defendant now asserts that he still could have received a death sentence and that he was entitled to a venire of thirty jurors.

This contention is answered by the ruling of this court in State v. Crider, Mo., 419 S.W.2d 13. There, as here, the state expressly waived the death penalty. In overruling a claim by defendant that the court erred in not providing a venire of thirty, the court said, 419 S.W.2d 1. c. 14: "However, the state, prior to voir dire, expressly waived the death penalty, as it may legally do and hence, defendant could only have received a sentence of from five years to life imprisonment, State v. Redding (Mo. Sup.) 357 S.W.2d 103, and State v. Garrett (Mo.Sup.) 282 S.W.2d 441. Defendant was therefore entitled only to eight peremptory challenges and a qualified panel of twenty-four jurors was sufficient, Sec. 546.180, subd. 1(2)." We overrule this contention.

Judgment affirmed.

All of the Judges concur.