**STATE of Missouri, Respondent,**

v.

**Dennis Lee THURMOND, Appellant.**

**No. WD 36194.**

Missouri Court of Appeals, Western District.

July 2, 1985.

C.J. Larkin, Columbia, for appellant.

William Webster, Atty. Gen., Michael Finkelstein, Asst. Atty. Gen., Jefferson City, for respondent.

Before BERREY, P.J., and DIXON and KENNEDY, JJ.

BERREY, Presiding Judge.

Defendant Dennis Lee Thurmond was charged and convicted of two counts of felony stealing and sentenced as a persistent offender, from which he takes this appeal.

Count I alleges defendant appropriated a Homelite 240, 16-inch chain saw valued in excess of $150.00, from the K–Mart in Jefferson City, Missouri, and Count II alleges he appropriated a Sears electronic typewriter model 5309 and a Sears electric typewriter model 5301 from the Sears, Roebuck and Company in Jefferson City, Missouri.

On September 5, 1983, the defendant and one Troy Raymond Poss engaged in a shoplifting spree in Jefferson City, Missouri. Poss testified he and defendant took three typewriters from Sears and chain saws and miscellaneous clothing from K–Mart. Defendant was not charged with theft of the miscellaneous items.

The typewriters were not recovered. The evidence of Michael Lucas, an employee for twenty-four years with Sears, established the fact that the typewriters were missing from his store's inventory on September 7, 1983. Two model 5309 portables and one larger machine model 5301 were missing. These were in inventory when the store opened on Labor Day, September 5, 1983, at 10:00 a.m. The cost to the store for the two missing model 5309 typewriters was $242.66 and the cost of the model 5301 was $185.14.

Mr. Lucas produced the store's receipt for these typewriters. State's exhibits 1 and 2 were received over defendant's objection showing the store's acquisition and their cost of the missing typewriters. Defendant contended that since the machines were not recovered and no serial numbers were adduced from the missing machines it was error to receive evidence about the typewriters being at Sears. Mr. Lucas identified exhibit 3 through 6 as photos of the Sears building and stockroom, the latter being where the typewriters were stored.

Informant Poss described their foray into the Sears store in detail such as could only have been obtained by personal observation. He stated defendant parked the car

in a no parking zone by the side door where there were shrubbery and small trees.

Poss identified exhibit 3 as being the Sears store where they had gone and he indicated thereon where they parked and where they entered the store. Poss testified that once inside the store, the defendant entered the storeroom located by the vanities, sinks, and tubs. He came out of the storeroom with two typewriters and placed them in a vanity. He then reentered the storeroom and returned with a larger typewriter and placed it next to a toilet. Poss testified, "Then we waited until some people left that was there shopping close to the door, and he said, 'Let's go,' and I picked up the big typewriter and I walked out of the store; and he picked up the two small ones out of the vanity, and then he came out; we put them in the truck and we left." Poss acknowledged they had no permission to remove the items from Sears.

The following exchange occurred between the prosecuting attorney and Poss:

Q. Now, Mr. Poss, you described coming up to Columbia, Missouri, with Mr. Thurmond, and then coming to Jefferson City sometime later; did you and Mr. Thurmond have any conversations concerning the purpose for your coming to central Missouri?

A. Just to get whatever we could get out of the stores and take it back to the city and sell it.

Q. Does that mean it was your purpose then to steal things?

A. Yes, sir.

Poss further gave evidence incriminating defendant in the theft of merchandise and chainsaws from K–Mart in Jefferson City. He gave a detailed account of the store, its location, how it was built and what transpired once he and defendant were in the store. The informer stated the defendant told him to get a cart; he did and he pushed it while defendant put in two Sony Walkmans, some Jordache Jeans, and three chainsaws.

Poss identified exhibits 14 and 15 as being a chainsaw and box taken from the K–Mart. He also identified exhibits 16 and 17 as being a chainsaw and box taken from K–Mart. The cart was then pushed to the "patio door" and into the garden shop area which was enclosed by chain-link fence. Defendant instructed Poss to go get the car and drive it up to the fence. Defendant then "threw the boxes, and the clothes, and the Sony Walkmens over the fence and I put them in the trunk, and shut the trunk; and Dennis told me to pull around front and pick him up."

The following exchange then took place between the prosecuting attorney and Poss:

Q. Now, with regard to these items that you took from the K–Mart store, did anyone give you permission, you and Mr. Thurmond permission to take them?

A. No, nobody told us we could take anything.

Q. And with regard to the two chainsaws that you have identified earlier, are those the two chainsaws you described taking?

A. Yes, sir.

Mr. Coronet, Assistant Manager of K–Mart, testified that the chainsaws were missing, two Homelite XLs and a Homelite 240 with a 16-inch bar. The cost of the XLs was $88.59 each and the cost to the store of the 240 was $161.69. The manager identified state's exhibit 14 as the Homelite 240 chainsaw with the 16-inch bar. He then identified defendant's exhibit 15 as the box with the serial number matching exhibit 14. Exhibit 16 was identified as the Homelite XL chainsaw with a 10-inch bar. Exhibit 17 was the box. The serial number on exhibit 16 matched the serial number on the box, exhibit 17.

The property was recovered in St. Louis and this prosecution followed. Defendant raises three points. First, the trial court erred by not quashing the jury panel as its selection was improper; second, plain error was committed by the trial court in permitting the prosecuting attorney to cross-examine alibi witnesses regarding their failure to notify police or the prosecuting attorney regarding defendants whereabouts

on the day in question; and finally, there was insufficient evidence to sustain the jury guilty verdict.

■ On Point I the appellant is raising this issue for the first time on appeal. He did not file a motion to quash the jury panel, nor did he challenge the array, nor did he raise the issue in his motion for a new trial. The matter is taken up *ex gratia.*

While the defendant cites several authorities he bottoms his prayer for relief in Point I on *State v. Bynum,* 680 S.W.2d 156 (Mo. banc 1984). However, this case is distinguishable in that the defendant in *Bynum* developed his basic challenges to the jury selection at a pretrial hearing whereas in the instant case the defendant alleges that the trial judge should have *sua sponte* quashed the jury panel.

As Judge Blackmar noted in *Bynum,* at 160:

The purpose of the jury selection statutes is to provide a jury pool containing a fair cross section of the adult population, with random selection of jurors from that pool, all in accordance with the requirements of the federal and state Constitutions. There is a strong presumption that the jury tendered at the outset of the trial has been properly selected. One who would challenge the jury panel must do so before trial by pleading and proving fatal departures from the basic procedural requirements. A defendant cannot stand trial, hoping for acquittal, and then challenge the selection of the jury which convicts.

Defendant herein asserts the deputy sheriff was in charge of the selection of the jury but adduces no evidence to substantiate this claim other than the fact that the jury in *Bynum* was selected contrary to the statutes. The court in *Bynum* found "no constitutional infirmity in the procedures prevailing in Cole County." *Bynum,* at 161.

The *Bynum* court also noted it was "not authority for disturbing the result in any case in which the array was not challenged prior to trial." *Bynum,* at 161.

Defendant's Point I is denied.

■ The defendant in Point II alleges that the trial court should have *sua sponte* prevented the prosecuting attorney from cross-examining the alibi witnesses about their failure to contact the prosecuting attorney or police regarding defendant's whereabouts on the day in question.

In *State v. Kirk,* 636 S.W.2d 952, 955 (Mo.1982), the appellant's sister provided him with an alibi. She was questioned at trial about why she had not earlier notified the prosecutor or police about her alibi information. The witnesses in *Kirk,* as in the instant case, testified that the alibi had been disclosed to the defendant's attorney. The *Kirk* court opined, "The prosecution made no improper attempt to discredit this response. There was no manifest prejudice in these inquiries." *Kirk,* at 955.

■ A witness may be impeached upon cross-examination, *State v. Dunn,* 577 S.W.2d 649, 653 (Mo. banc 1979), and the trial court has discretion in determining the extent of cross-examination specifically regarding collateral matters. *State v. Dixon,* 566 S.W.2d 254, 255 (Mo.App.1978).

The appellant cites *State v. Carter,* 557 S.W.2d 47, 50 (Mo.App.1977), as supportive of his contention that the trial court should have *sua sponte* warned the prosecuting attorney to refrain from cross-examining the alibi witnesses about why they did not come forward and tell the authorities about their alibi and further, the trial court should have *sua sponte* admonished the jury to disregard the questions and responses. However, the court in *Carter* affirmed the conviction and cited *State v. Smith,* 358 Mo. 1, 212 S.W.2d 787, 789 (1948), which holds that an instruction or a comment by a prosecuting attorney tending to disparage an alibi witness is erroneous. Such was not the instant case. Here the prosecuting attorney simply cross-examined each defense witness. There is no record of any badgering, disparagement or prosecutional abuse.

The cross-examination of defense witness Pat Stocks was five pages without objection to any question. The cross and re-cross of defendant's wife were seven pages and interrupted by one objection to the materiality of a question. The question was: "Do you remember what time you got there? [to St. Louis]." She responded after the objections and ruling, "It was afternoon." The objection was overruled.

Finally, the cross of defendant's step-mother is contained in seven pages and only one objection was made by defendant to any portion thereof. It was sustained. Clearly, the prosecuting attorney did not abuse these witnesses.

Point II is ruled against defendant.

 The defendant challenges the sufficiency of the evidence in his final point. In challenging the sufficiency of the evidence to sustain the conviction we must accept as true that evidence in the record tending to show defendant's guilt together with all favorable inferences and to disregard evidence and inferences to the contrary. *State v. Griggs*, 445 S.W.2d 633 (Mo.1969).

The defendant offered three alibi witnesses, his wife, Mary Charlene; his mother-in-law, Carol Troll; and Pat Stocks, a friend of Mrs. Troll, who had known the defendant for a year to a year and a half. As one might expect the defendant's witnesses told virtually the same story. Mrs. Troll and Pat Stocks testified they left Columbia for St. Louis about 8:30 a.m., the morning of September 5, 1983, and arrived at defendant's home in St. Louis about 10:30 a.m., and claimed that defendant was there with his wife and daughter. The group "barbecued, drank beer and played with the baby" from 11:00 a.m. until 8:00 or 8:30 p.m. During this period the defendant never left the residence. Mrs. Troll acknowledged the defendant and his wife had been in Columbia on Friday, September 2, to celebrate her birthday and that they left on Saturday night.

On cross-examination Mrs. Troll stated in response to a question about her testimony regarding defendant's whereabouts on September 5th that, "no one ever asked us." She admitted that she never tried to tell anyone about the fact that defendant was with her on September 5, until a week prior to trial when she was contacted by an investigator for the Boone County police.

Defendant's wife, Mary Charlene, offered similar testimony as did Pat Stocks.

It is obvious the jury elected to believe the testimony of co-conspirator Poss over the alibi evidence of defendant's wife, mother-in-law and her friend. The jury determined the weight and credibility of Poss' testimony.

The defendant argued that the prosecution was alleging the witnesses perjured themselves. The prosecuting attorney objected to this argument and after a brief bench discussion the defendant's attorney stated, "I will withdraw it" and the court then instructed the jury to disregard same. Had it not been withdrawn a question under *Griggs* might arise.

This is the converse of what transpired in *State v. Griggs, supra,* at 635, where the state alleged in closing argument that defendant's witnesses offered perjured testimony. Defendant's objection was overruled, the court saying it was mere argument.

Finally, we note a conflict between Mrs. Thurmond's testimony and that of police officer Qualls. Qualls testified that Poss walked past Mrs. Thurmond on the date of the preliminary hearing and he heard Mrs. Thurmond say to Poss, "How would you like to be dead." At trial she denied making such a statement.

The state's argument was proper and Point III is ruled against defendant.

Judgment affirmed.

All concur.