THE STATE v. DUDLEY BARR, Appellant.—102 S. W. (2d) 629.

Division Two, March 11, 1937.

C. H. Calloway and Roy N. De Vault for appellant.

740

*Roy McKittrick*, Attorney General, and *J. E. Taylor*, Assistant Attorney General, for respondent.

COOLEY, C.—Appellant was convicted of murder in the first degree for the killing of Walter Milton. The jury assessed his punishment at death. He was sentenced accordingly and has appealed. This is the second appeal in this case. Upon the first trial appellant received a like sentence. We reversed that judgment and remanded the case for certain errors in the instructions. [See State v. Barr, 336 Mo. 300, 78 S. W. (2d) 104.]

Appellant has filed no brief in this court. From the State's brief we adopt the following short and succinct statement of the facts, which may be considered supplemented by the statement of facts given in State v. Barr, supra:

"The evidence on the part of the State tended to show that on December 14, 1932, between the hours of five-thirty and six o'clock P. M., the defendant together with two other negroes were driven to 12th and Lydia Streets in Kansas City, Missouri, by Edward Ross, a taxicab driver. A man in a Graham Paige car drove up behind them and got out of his car and into the taxicab, with a gun in his hand, and commanded the driver of the taxi to sit still. Dudley Barr and the other two men got out of the taxi and went around on Lydia Street to a place known as the 'Flying Cloud Policy Wheel' which was operated by George Mehan, who was also known as George Kondos. The appellant, Barr, put his gun on the doorman and commanded one of his companions to stay on the door while he and his other companion marched the doorman upstairs to where the policy wheel was operated, and announced 'This is a holdup.' During the progress of the holdup appellant took money and a watch from Kondos and others. He also made threats to kill and shot his pistol into the floor at the feet of one of the patrons of the game and stated 'This goes to show that this is no toy.' He then reloaded his pistol and hit Kondos in the side of the face and made him open his mouth and stuck the muzzle of the gun in his throat and threatened to kill him. An employee of Kondos begged the defendant not to kill Kondos and gave him some more money that was under the counter. Defendant then started to leave looking the crowd over when he saw a man by the name of Walter Milton to whom he stated, 'You are the fellow that knows me and you can identify me, before I leave here I am going too kill you.' Milton who had his hands up replied, 'No, Mister, I don't know you, I don't know you.' Appellant then shot Milton, who fell to the floor. He stood over him and shot him twice more. Milton died immediately. Appellant then left.

"A number of witnesses positively identified appellant and also identified the gun and coat which were found in appellant's room at

the time of his arrest as the coat he wore on the night of the holdup, and the gun as the one he shot Walter Milton with.

"The defense was an alibi that tended to show that the defendant had been drinking on the afternoon in question and had become inebriated to the point of helplessness and could not, therefore, have committed the robbery and murder."

Further facts as may be deemed necessary will be stated in the course of the opinion.

Since appellant has not briefed the case here we must look at his motion for new trial for the grounds on which he seeks reversal. His first contention is that the court erred in overruling his motion to quash the information. The complaint regarding the information is; first, that in stating the venue it alleges that the offense was committed "at the County of Jackson, State of Missouri," instead of, as the evidence showed and appellant says the information should have charged, "in" or "within" said county; and, second, that the information "does not charge what kind of a weapon was used in the alleged murder."

As to the first criticism the preposition "at" instead of "in" or "within" has often been used in stating the venue and we have never before known such use to be criticized. It was so used in State v. Naylor, 328 Mo. 335, 40 S. W. (2d) 1079, wherein the indictment was held sufficient (though not assailed on that ground) and wherein we pointed out that under the statute, Section 3563, Revised Statutes 1929 (Mo. Stat. Ann., p. 3160), no indictment or information shall be deemed invalid or judgment or other proceedings thereon stayed or affected for want of a proper or perfect venue. We have also held, applying Section 3555, Revised Statutes 1929 (Mo. Stat. Ann., p. 3153), that where no venue is stated in the body of an information or indictment the county or other jurisdiction named in the margin thereof shall be taken to be the venue for all the facts stated in the body of the same. [State v. Connor, 318 Mo. 592, 300 S. W. 685.] Such is the clear mandate of the statute. In the instant case the venue is stated in the caption of the information as was true in State v. Connor, supra. For both reasons indicated this criticism of the information is without merit.

The second ground upon which the information is assailed is equally untenable. The information charges that the homicide was committed with a pistol loaded with gun powder and leaden balls —a sufficiently definite charge. Appellant's real complaint on this point appears to be that there was a variance between pleading and proof because the witnesses, or at least some of them, spoke of the lethal weapon as a revolver. We think that there was no real variance. Webster's New International Dictionary defines "pistol" as "a short firearm intended to be aimed and fired from one hand.

Pistols were first used about 1540. They are now usually either revolvers (which see), or automatic or semi-automatic magazine pistols.'' It follows that a revolver is a pistol. It is often called a revolving pistol. But even if it could be said that there was a variance, such variance is immaterial. See Section 3562, Revised Statutes 1929 (Mo. Stat. Ann., p. 3158); Section 3563, Revised Statutes, 1929, supra; State v. Webb, 254 Mo. 414, 434, 162 S. W. 622, wherein the information charged the use of a revolving pistol and the proof showed the use of an automatic pistol; State v. Wilson (Mo.), 34 S. W. (2d) 98, 101, in which the information charged that the weapon used was loaded with a leaden ball and there was no proof that said ball or bullet was of lead. We said it could make no difference whether the bullet was of lead or some other metal.

■ Defendant complains of instructions Nos. 1 and 2 by the court. Instruction No. 1 defines various terms used in the information, such as ''deliberately,'' ''premeditatedly,'' etc. Instruction No. 2, reads:

''The court instructs the jury that if you find and believe from the evidence beyond a reasonable doubt, that at the County of Jackson, State of Missouri, on the 14th day of December, 1932, the defendant, Dudley Barr, either acting alone or knowingly acting in concert with another or others while in an attempt to perpetrate and commit robbery, if you so find, unlawfully, feloniously, willfully, deliberately, premeditatedly, and of his malice aforethought did with a certain pistol shoot one Walter Milton, inflicting upon him a mortal wound from which said mortal wound he the said William Milton within one year and one day thereafter, at the County of Jackson, State of Missouri, died; then you will find the defendant, Dudley Barr, guilty of murder in the first degree and assess his punishment at death or imprisonment in the state penitentiary for and during his natural life; and unless you find the facts to be as above stated in this instruction, you will acquit the defendant.''

The criticism of Instruction No. 1 is, not that the definitions therein contained were in themselves inaccurate but that there should have been no definition of ''deliberation'' given other than the fact, if found, that the killing was done in the perpetration or attempt to perpetrate robbery, since all the evidence tended to show that it was so committed, and that the inclusion of a definition of ''deliberately'' such as would be proper in a case of murder not committed in the perpetration or attempt to perpetrate robbery (or other offense mentioned in Sec. 3982, R. S. 1929, Mo. Stat. Ann., p. 2778), tended to confuse and mislead the jury. Of Instruction No. 2 it is claimed that it is erroneous in that it named two deceaseds, Walter Milton and William Milton; that it ''does not confine the finding of the jury to Jackson County;'' because according to the evidence, a revolver

and not a pistol was used; because it *assumes* that defendant killed the deceased; and because it directs the jury to find two things, viz., that the killing was done in the perpetration of or attempt to perpetrate robbery and also that it was done "unlawfully, feloniously, willfully, deliberately, premeditatedly and of his malice aforethought." These assignments may be considered together.

There was evidence from which the jury could have found that the killing was done with actual deliberation and the definition of deliberation was therefore not out of place. But also, under the statute, Section 3982, supra, proof that the homicide was committed in the perpetration of robbery supplies the place and is the legal equivalent of deliberate and premeditated malice (State v. Robinett (Mo.), 279 S. W. 696, 700), or, as stated in State v. Moore, 326 Mo. 1199, 1204, 33 S. W. (2d) 905, 906, "deletes the necessity of proof tending to show deliberation, for the statute renders such a state of facts the equivalent of deliberation." If the jury found that defendant killed deceased in an attempt to commit robbery, as required by Instruction No. 2, such fact amounted to proof of deliberation or its legal equivalent, under the statute, and the further requirement to find that the killing was done with actual deliberation, if the jury so understood the instruction, only cast an additional burden on the State and could in nowise have harmed the defendant.

The contention that Instruction No. 2 does not "confine the finding of the jury to Jackson County" is answered by what we have said above on the question of venue and by reading the instruction. The claim that the instruction *assumes* that defendant killed deceased is also clearly without merit. It does not so assume but requires the jury so to find. That the homicide was committed in Kansas City, Jackson County, Missouri, was clearly and abundantly shown by the evidence and there was no dispute about that fact. The contention that there was a variance between pleading and proof in that the information and the instruction referred to the lethal weapon as a pistol and the proof showed the use of a revolver has been sufficiently discussed. It is ruled against defendant.

Instruction No. 2 at one place erroneously states the name of deceased as William Milton. It requires the jury to find that defendant shot *Walter* Milton, "inflicting upon *him* a mortal wound from which . . . *he the said William Milton* . . . died." All the evidence identified *Walter* Milton as the deceased. There was no evidence to the contrary. He was personally known to most of the witnesses. The information charges the murder of Walter Milton. It is obvious that the naming of *William* Milton in the above-quoted portion of the instruction was a clerical error or an oversight of some kind. How it crept into the instruction we do not know, but we are convinced that it could not possibly have confused or misled the jury.

There was no possible doubt and no contention as to the identity or the correct name of the deceased. In these circumstances the said error in naming the deceased in said instruction could not have been prejudicial, and non-prejudicial error is not reversible, as we have often held.

Defendant requested and the court refused to give an instruction, B, reading as follows:

"The court instructs the jury that if you find from the evidence that the defendant took a drink and that said drink contained a drug, or was doped, whereby said defendant's reasoning powers were destroyed and that he was thereby caused to lose consciousness of his acts, and became unable thereby to distinguish right from wrong, and adhere to the right, and shun the wrong; and if you further find that said drugged, or doped liquor was administered to him by another, or others, without his knowledge, surreptitiously by connivance, strategem or trick; then in that event (if you so find and believe), then, even though you may believe that he killed the deceased, you must acquit him."

In our opinion there was no evidence that called for or would have justified the giving of such instruction. There is evidence in the record that defendant had been drinking whiskey to a considerable extent during the afternoon of December 14th, though the State's evidence tends to show that at the time of the robbery and homicide, about six or six-fifteen P. M. that evening, he appeared to be in full possession of his faculties. But there is no semblance of evidence that he had been given a drug or drugged liquor, surreptitiously or otherwise, unless it be found in his own testimony. On this point he testified that during the afternoon he had imbibed twelve or fifteen drinks of whiskey; that about five o'clock he went up to his apartment; that soon thereafter a friend, James Turner (who the State's evidence indicated was one of the defendant's accomplices in the holdup), came, having with him a bottle containing about a third of a pint of whiskey, out of which defendant took a drink, after which he "commenced to feeling kind of funny;" that it did not taste like other whiskey he had drunk—"it just kind of tasted bitter;" that he knew the taste of quinine but did not notice whether or not this whiskey tasted like quinine, that "it had a bitter whang to it." He did not "smell the odor." He said, "When I drank that I got high." He testified, however, that though staggering somewhat he was not "crazy drunk" when Turner came and that, following the drink above mentioned, Turner suggested "Come go out for a ride and cool off and get some fresh air so you can sober up." They first went, however, to a restaurant where defendant bought a half pint of whiskey, for which he paid twenty-five cents. He remembered all these circumstances. He testified that after he bought said last half pint of

whiskey Turner led him out of the restaurant "and I sit down in the back seat of that car and pulled the cork out of that bottle ·of whiskey I bought and taken a drink . . . and one of the boys said, 'take that bottle of whiskey away from that son-of-a-bitch, he is drunk now,' and that is the last I remember. When I came to it was between midnight and day;'" that when he regained conscious-ness he was at home, lying on the bed; that he was "feeling funny" —had a headache, had never felt that way before or since though he had been drunk many times.

In all this we can see nothing more than evidence tending to show voluntary intoxication, which does not excuse crime. [See State v. Lloyd (Mo.), 217 S. W. 26; State v. Ramsey, 82 Mo. 133; State v. Sneed, 88 Mo. 138; State v. Brown, 181 Mo. 192, 211-213, 79 S. W. 1111.] That the drink of whiskey to which defendant seemed to at-tribute his subsequent "passing out" had a different taste from other whiskey he had drunk or had a "bitter whang to it" is too vague to justify a finding that it contained a stupefying drug. It may have been just bad whiskey. Moreover, defendant's testimony, if true, shows that he retained consciousness and memory until, with Turner, he had gone to the restaurant and purchased another half pint of whiskey, had gotten into the automobile and had there taken another drink out of the bottle of liquor he had bought—and no suspicion is suggested that the contents of that bottle had been drugged—before he finally, according to his testimony, lost consciousness. His further testimony that when he "came to" between midnight and morning he "felt funny—had a headache," does not tend to show that he had drunk drugged liquor. Absent evidence we cannot take judicial notice that a headache "in the cold gray dawn of the morning after" constitutes evidence tending to prove that one has imbibed *drugged* liquor. The most that can be said of defendant's testimony is that, if believed by the jury, it tends to show voluntary drunkenness, the cumulative effect of the drinking he had been doing, which, as we have said, does not excuse the crime. The question of whether or not defendant was so inebriated as to be unable to leave the automobile and go up to the place where the homicide occurred, therefore not present, was submitted, pursuant to our mandate on the first appeal, by an instruction given by the court at defendant's request, concern-ing which no complaint is made and which we think sufficiently pre-sented that issue. This assignment of error is ruled against appellant.

It is averred in the motion for new trial that the court erred in permitting the introduction in evidence of certain exhibits, viz., the revolver and coat taken from defendant when he was arrested a day or so after the robbery and murder, on the ground that they were not sufficiently identified. This contention is without merit. Several witnesses identified the revolver as the one defendant used in the

robbery and murder and the coat as the one he wore on that occasion, and defendant admitted on the witness stand that they belonged to him and had been taken from him when he was arrested.

It is assigned in the motion for new trial that the verdict is based upon perjured testimony of several named witnesses ''in that they and each of them testified that the defendant shot at Abner Stratmeyer's feet whereas as a matter of fact there are no bullet holes in the floor of the flat in either of the rooms in which they say he shot into the floor.'' There was abundant evidence that defendant did shoot at or toward Stratmeyer's feet, in order, as he said at the time, to demonstrate that the weapon he had was ''no toy,'' frightening Stratmeyer so that he jumped out of a window ten or twelve feet above the ground. There was testimony that bullet holes in the floor of the room were observed after the robbery and murder, and no testimony to the contrary. Obviously this contention cannot be sustained. It was a question for the jury. In this connection defendant says in his motion for new trial that he or his attorney could not get any of the negro tenants of the building in which the homicide occurred to ''come down and testify'' that there were no bullet holes in the floor, wherefore the court erred in refusing his request to have the jury go and inspect the premises. It is not shown that defendant subpoenaed or tried to procure the attendance of witnesses to prove the absence of bullet holes. Witnesses could have been subpoenaed and compelled to appear and testify—but probably not to testify as defendant wanted them to, because not in accord with the facts. But defendant saved no exception to the court's refusal to send the jury to inspect the premises and therefore we need not further consider this matter or the question of whether or not the court in the exercise of sound judicial discretion might have done so. We rule the point against appellant.

Complaint is made that the court erred in failing to give an instruction on good character. Defendant did not offer evidence of good character such as to call for an instruction on that subject. He did offer the testimony of several witnesses to the effect that he had paid to them his bills, such as laundry and grocery bills, promptly when due, but that is all. He admitted on the witness stand that he had previously served a term in the Kansas penitentiary, on a plea of guilty, for robbery. The court did not err in failing to instruct on good character.

It is assigned as error in the motion for new trial that the court erred in permitting certain alleged inflammatory remarks by counsel for the State in argument to the jury. We have examined the alleged inflammatory remarks as set out in the bill of exceptions and find no prejudicial error therein. Moreover, defendant saved no exceptions thereto nor to the court's ruling or failure to rule thereon,

wherefore we shall not take space to set out said remarks or further to discuss this contention.

In the motion for new trial defendant's attorney stated, as ground for new trial because of newly discovered evidence, that shortly before expiration of the time allowed for filing said motion a colored man named Brown, who said he lived at 1124 The Paseo, in Kansas City, told him that he, Brown, "knew three or four witnesses who said they had seen Dudley Barr dead drunk in the back end of a taxicab when the robbery and murder was being committed;" that he, said attorney, went that night to the address named and was told that no man by the name of Brown lived there, and that he had not had time to make further search for Brown or for said witnesses; and that if he was given time and opportunity—by the granting of a new trial—to make further search *and if* he could find said witnesses *and if* they would testify as indicated, the testimony would be material. The names of said alleged witnesses are not stated, nor their places of residence. That there were any such witnesses is, as shown by the allegations of the motion, very doubtful. The motion was not verified and no affidavits were filed or offered in support thereof nor was there any evidence offered in support of that claim. It is too well settled to require citation of authorities that allegations of that character in a motion for new trial do not prove themselves. For that reason, as well as for the apparent uncertainty—even unlikelihood—of defendant being able on another trial to procure the indicated testimony, this ground for new trial cannot be allowed. This case has been in court for a considerable time. It has been twice tried. Both juries found defendant guilty. He has had ample time in which to discover and produce all available evidence. On the record before us it would be trifling with justice to order a new trial on said ground of newly discovered evidence.

The foregoing disposes of all assignments of error in the motion for new trial except some that are therein stated too generally and vaguely to present anything for review and one or two that are not sustained by the facts as shown in the bill of exceptions. Most, if not all, of said general and vague assignments are, in effect, included in the specific assignments we have discussed. They are all without merit. Defendant appears from the record to have had a fair and impartial trial and, if the State's evidence is to be believed, his guilt was clearly established. The information, verdict and judgment are in due form and sufficient. We find no prejudicial error in the record. The judgment of the circuit court is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.

Date of execution fixed by the court for Friday, April 16, 1937.