THE STATE v. ARTHUR SCHNELT, Appellant.—108 S. W. (2d) 377.

Division Two, August 26, 1937.

242

·Roy McKittrick, Attorney General, Wm. Orr Sawyers, Assistant Attorney General, and Max Wasserman for respondent.

COOLEY, C.—Appellant, Arthur Schnelt, defendant below, and two others, Frank Kennedy and Charles Douthitt, were jointly indicted for murder in the first degree for killing Charles J. Abeln. The murder occurred in the city of St. Louis on the night of December 21, 1933, to be exact, between twelve and one o'clock A. M. of December 22nd. A severance was granted and in this case Schnelt was tried alone, the trial resulting in his conviction of murder in the first degree and a sentence to life imprisonment, from which he appeals. Though represented by counsel of his own choosing below he has filed no brief in this court, hence we must look to his motion for new trial for the alleged errors upon which he seeks reversal of the judgment. These contentions pertain mainly to the admission of certain evidence and will be more particularly pointed out hereinafter. The State's case proceeds upon the theory that appellant, Kennedy and Douthitt entered into a conspiracy to rob the deceased, Abeln, in the carrying out of which Abeln was shot and killed. We gather from the record that the case as against Douthitt had been disposed of prior to the instant trial by a plea of guilty, though sentence seems not to have been yet pronounced. Douthitt was used by the State as one of its principal witnesses. From his testimony the following appears:

Mr. Abeln operated several cigar stores in St. Louis, one of which, located near the junction of Broadway and Alberta Street, seems to have been regarded as the central or principal store. It was Abeln's custom to have the returns and receipts from his other stores

sent each night to this central store, where he and his wife would check them and from that store take the cash and checks, usually amounting to a considerable sum, to a bank where they had arrangements for making deposits at night. This custom was known to appellant, probably to Kennedy, though not at the time to Douthitt.

Douthitt testified that on December 20th he met Kennedy at a saloon, owned by appellant and then operated by appellant's brother or brother-in-law, where Kennedy asked him if he wanted to "cut in" on a robbery which Kennedy and appellant proposed to "stage" —which was, as shown by Douthitt's further testimony, the robbery of Abeln; that he at that time declined; that the next day, December 21st, he again met Kennedy at the same place and agreed to participate; that Kennedy then said he would see appellant and ascertain if it was all right with him for Douthitt to come in; and that about an hour later he met appellant, who told him "It is O. K. Gates, it is all right, you can go." Said conversation between Kennedy and Douthitt was objected to because not in the presence of appellant. The admission of that testimony is one of the grounds urged for reversal.

If further appears from Douthitt's testimony that he, Kennedy, and appellant met in said saloon later that evening, December 21st, and together, at about eleven-forty-five p. m., left there and entered a Chevrolet sedan automobile which appellant thereafter drove; that upon entering said car appellant handed him (Douthitt) a .32 Colt's automatic pistol and Kennedy picked up from the floor of the car a ".380 Remington." The trio then proceeded to the vicinity of the above-mentioned central store of Mr. Abeln. On the way appellant stated that the "loot" from the intended robbery would be split three ways and that "the tipper" was to get ten per cent; that appellant would drive the car and that Kennedy and Douthitt would "pull the robbery." Exact plans were made by the three conspirators for the carrying out of the robbery and for their escape, pursuant to which Kennedy and Douthitt got out of the car and stationed themselves in a doorway opposite the door of the cigar store through which Abeln was expected to emerge. Appellant drove a short distance south on Broadway and stopped, remaining with the car. He was to pick up his confederates immediately after they had accomplished the robbery and the three were to flee together in the car.

Presently Mr. and Mrs. Abeln came out of the store and started walking toward their automobile, parked a short distance away, Mr. Abeln with his left arm linked in his wife's right arm and with his right hand in his overcoat pocket. Mr. Abeln was carrying the satchel or money bag containing the money and checks in his left hand. Pursuant to their prearranged plans Douthitt and Kennedy "cut across" the street so that Douthitt could and did approach the

Abelns from in front, meeting them, and Kennedy approached them from behind. The Abelns apparently did not observe that movement. Kennedy was to give a command to the Abelns to throw up their hands and either he or Douthitt was to get the money. Kennedy gave such command. Mr. Abeln turned, at the same time withdrawing his right hand, with a pistol therein, from his overcoat pocket. A fusillade of shots followed instantly, and Mr. and Mrs. Abeln fell, mortally wounded. Subsequent developments indicated that one or two shots were apparently fired by Abeln and six or eight by his assailants—Douthitt says by Kennedy. They were all in quick succession. Whether Abeln fired before or after he was hit by Kennedy's shots is not clear, nor is it here material. Abeln was rushed to a nearby hospital by persons attracted to the scene by the shooting. He died either on the way there or very soon after reaching there, without making any statement. Mrs. Abeln appears to have been killed instantly. Her dead body was found at the scene of the holdup. Further details as to the attempted robbery and the murder are unnecessary.

According to Douthitt's testimony he and Kennedy immediately fled the place of the shooting without pausing to secure the intended loot. They left by different routes but very soon met and went to the place where their car, with appellant therein, was supposed to be waiting for them and found it gone. They hid their guns under some leaves at a place described by Douthitt, and then separated, Douthitt spending the rest of the night in a certain shed and getting to his home about seven o'clock in the morning. He said that about eleven A. M. (on the 22nd) appellant and Kennedy came to his room and appellant told him that he (Douthitt) had nothing to worry about; that he (appellant) had been chased that night by the police but had gotten away and believed that "they" had mistaken the last number, "7," on his license plate for a number "1." In the afternoon of that day, the 22nd, he again met appellant at the saloon and appellant said that the reason he had not picked up Douthitt and Kennedy was that he started north on Broadway when the shooting started and although he circled around the block several times he couldn't find them. Douthitt left the saloon about five-thirty that evening. Later that evening he borrowed two dollars from appellant and a car from Kennedy and moved from the room he then occupied to another place.

At about the time of the shooting five young men were on the sidewalk near the place where appellant was supposed to be waiting in his Chevrolet car. They heard the shooting and immediately thereafter observed a Chevrolet car (which fairly fits the description of appellant's car) driving rapidly, cutting corners and ignoring stop signs. As well as they could catch the number on the license plates

246

it appeared to them to be "345-461." That license number and a description of the Chevrolet car was broadcasted to the police force. A police officer testified that he received said license number and a description of the Chevrolet car from the radio dispatcher about twelve-fifty-five in the morning of December 22nd, and "spotted" a car answering that description with a license plate which he thought bore said number. He chased that car for some distance, in the course of which he fired two shots at it, but finally lost it. Later, about February, 1934, a Chevrolet car, answering the description of the one above mentioned, was found at a garage. It then bore no license plates and had a bullet hole over the window glass in the back. Investigation developed that the license number 345-461 belonged to a Ford V-8 automobile owned by a man living at Kirkwood, not involved in the robbery and murder. Evidently—as appellant thought—the young men and the police officer had mistaken the last figure of the license number. It is not shown who left the Chevorlet car at the garage where it was found in February, 1934, nor when it was left there, but the officer testified that "it was recovered on Montgomery Street." (However, an objection to this question, "unless he himself recovered it," on the ground that "the question doesn't cover that phase," made after the question had been answered, was sustained. There was no motion to strike the testimony.)

Prentice Trimble, a taxi driver, was called as a witness for the State. He had known appellant, Kennedy and Douthitt several years. He saw them together at the above-mentioned saloon about six P. M., December 22nd, and heard them talking about the robbery and murder. He testified that he there heard appellant say that he had not run away from the other two but had circled the block trying to find or catch up with them. He said that he was in the saloon about fifteen minutes, appellant being present during that time, when he and Kennedy left, the latter requesting witness to drive him somewhere; that he took Kennedy to a point which, from the description given, appears to have been about a block from the place where the shooting had occurred and inferably, from the evidence, was the place where Douthitt and Kennedy had hidden their pistols under some leaves immediately after the shooting; that Kennedy there got out of the taxi and after being gone about five minutes returned with a "package," the contents of which he did not then see; that after returning to the taxi and before they went back to the saloon Kennedy asked him to throw away for him (Kennedy) a ".380 automatic Remington" pistol, which witness declined to do. They then went back to the saloon, arriving before seven P. M. and finding appellant still there. In about five minutes Trimble, with appellant and a stranger whom Trimble did not know, re-entered Trimble's car and, seemingly at appellant's direction, Trimble drove to a

garage "in back of Montgomery Street." It is inferable from the record that this was the garage from which, later, the above-mentioned Chevrolet car, *sans* license plates, was "recovered." When witness and appellant and said stranger thus left the saloon, witness driving and the other two in the back seat, witness observed a .380 Remington automatic pistol in the car. It was not his and he had not put it there. This pistol, later recovered by officers, as we shall show, was identified by Douthitt as the one used by Kennedy in the murder and was introduced in evidence. On the way from the saloon to the garage appellant asked witness if there was a quarry big enough for a Chevrolet car to be dumped in. Witness thought not. There was something said about burning up that car, which "didn't seem to meet with approval and that was the end of it."

When they arrived at the garage they parked in front of the door and appellant and the stranger got out of the car and went into the garage. Trimble's attention was attracted by "a little noise like somebody unloosening a piece of tin." Through the open garage door he observed the rear of a Chevrolet sedan automobile with a "small hole just over the rear glass." Later, on that drive, appellant, speaking of "how that hole got in that car," "made a crack somebody threw a slug at him," "some copper . . . on South Broadway." (The place where the officer above mentioned fired at a fleeing automobile was on South Broadway.) The description of the car thus seen by Trimble, as given by him, corresponded fairly well with the description given by other witnesses of the car driven by appellant at the time of the shooting.

Testifying further, Trimble said that after he heard said "rattling noise" (as of tin being loosened), appellant and the stranger came out of the garage, one of them threw into the car something that looked and sounded like tin "rolled up like a can," both got back in the car and the three left. Appellant told Trimble not to throw away the "piece of tin" and the .380 Remington automatic at the same place,—that if both were found in the same place they would "form a connection." Soon thereafter appellant got out of the car and another man, a stranger to Trimble, got in—apparently not exactly at the spot where appellant got out, but near. With the two strangers—the one who originally entered the car with appellant and the one later picked up as just stated, Trimble drove south on Elliott Avenue to Howard Street, where the "piece of tin,"—which later proved to be a license plate—was deposited in a toilet. The men then proceeded to a point on the River Des Peres, into which the pistol was thrown. All this happened on December 22, 1933.

Trimble was arrested in March, 1934. As well as we can gather from the record he was arrested as an accessory after the fact. It does not appear that he was an accessory before the fact. He was

not a co-indictee with appellant, Kennedy and Douthitt. What disposition of his case, if any, had been made at the time of trial is here immaterial. If he expected leniency, as may well be, it goes only to the weight of his testimony. After his arrest Trimble went with officers and pointed out the places where said rolled up "piece of tin" and Remington pistol had been thrown, which articles were found at said respective places and were identified by Trimble at the trial. The rolled-up piece of tin proved to be a license plate bearing the number 345-467. After the license plate and the Remington automatic pistol had been thus disposed of Trimble, at his home, met appellant and Kennedy and told them where he had thrown said license plate and pistol. It may be further stated here that, according to Trimble's testimony, while he, appellant and the first above-mentioned stranger were together in Trimble's car on the evening or night of December 22nd, for the purpose of making away with the license plate and the Remington pistol, Trimble heard appellant say to said stranger that "one of those five fellows"—referring to the five young men above-mentioned—"got the wrong license, the last number wrong."

The foregoing sufficiently outlines the facts. If further facts are deemed necessary they will be stated in the course of the opinion.

■ In his motion for new trial defendant alleged first that the indictment charged no offense and second, that the verdict "is against the law and the evidence." The indictment is in the usual form, such as has been frequently approved, charging murder in the first degree and is sufficient. It would serve no useful purpose to quote it. The second assignment, besides being too general, is obviously without merit. There was ample evidence, if believed by the jury, to sustain the verdict. The credibility and weight thereof were for the jury.

■ Error is assigned in that the court admitted the testimony of Douthitt that Kennedy asked him at the saloon, on the evening of December 21st, if he wanted to "cut in" on a robbery "supposed to be staged" by Kennedy and appellant. The ground of this assignment is that appellant was not present and there was as yet no evidence in the case tending to show the existence of a conspiracy between Kennedy and appellant. This contention cannot be sustained. In State v. Stogsdill, 324 Mo. 105, l. c. 129, 23 S. W. (2d) 22, l. c. 31, (25, 26), we said: "While as a general rule there should be proof of a conspiracy before the acts or declarations of a conspirator can be admitted against his coconspirator, the rule is not inflexible. The order of proof rests largely in the discretion of the trial court." (Citing cases.) [See, also, State v. Midkiff (Mo.), 286 S. W. 20, and cases therein cited.]

In the instant case Kennedy's statement to Douthitt indicated that

he (Kennedy) and appellant contemplated a robbery but that he would have to see appellant to learn if the latter would consent to let Douthitt "cut in" with them. Within an hour or so appellant met Douthitt and without preliminaries or explanation told him "It is . . . all right, you can go." Clearly, Kennedy had, during that hour, conferred with appellant. Thereafter, the same night, the three went together to the place where the robbery was to be committed and together arranged and agreed upon plans for the commission of the crime. That alone is positive and sufficient evidence to establish the conspiracy. Moreover, appellant aided and abetted in the actual commission of the crime. He drove the car in which he and his confederates went to the scene of the crime for the purpose of robbery and remained conveniently near while they, with his knowledge and pursuant to prearrangement, were to commit the overt act and with the understanding and agreement that the three would then escape together in said car and divide the spoils. In these circumstances the admission of the testimony of Douthitt as to said conversation between him and Kennedy was not prejudicial error.

It is alleged that the court erred in admitting the testimony of witness Trimble to the effect that he and Kennedy went to the place described by Douthitt as the place where he and Kennedy had hidden their pistols under some leaves immediately after the shooting and to the fact that Kennedy there secured a "parcel" or "package" (which it later developed contained the above-mentioned Remington pistol); also that the court erred in admitting Trimble's testimony as to throwing away said pistol and the above-mentioned rolled-up license plate. These contentions are upon the ground that appellant was not present when these acts were done and that they were done after the crime had been consummated and, as we understand the purport of appellant's contention, after the conspiracy had ended.

In State v. Strait (Mo.), 279 S. W. 109, l. c. 114, it is said: "When, after the commission of a crime, some act is undertaken by the conspirators to avoid exposure, to conceal the evidence of the crime, . . . to take means to prevent or defeat a prosecution during such time, statements of one conspirator are admissible in evidence against another." (Citing authorities.) [See, also, State v. Costello (Mo.), 252 S. W. 727.]

If statements of a coconspirator are thus admissible why not his acts such as those here shown? Whether or not the rule above quoted is always applicable, it is certainly applicable in the circumstances of the case before us. Indeed, it seems hardly necessary to invoke such rule. While appellant was not present when Kennedy procured the Remington pistol from the place where he and Douthitt had hidden it under leaves he in effect ratified and adopted Kennedy's

act in so doing.  The pistol was at once brought to the saloon where appellant was.  He evidently knew it was the pistol which Kennedy had used in the attempted robbery and the murder and he then took charge of it.  He had Trimble take him to the garage where the Chevrolet car was and with his companion, a stranger to Trimble, removed the license plate from said automobile.  He directed Trimble to throw away—dispose of for the purpose of concealment—said pistol and license plate and not to throw them both at the same place.  Trimble obeyed appellant's instructions.  What one does through another he does himself.  This contention is ruled against appellant.

It is contended that the license plate and the Remington pistol were not sufficiently identified to authorize their introduction in evidence.  Without taking space to detail the evidence on this point it is sufficient to say that they were sufficiently identified and were properly admitted in evidence.

In his motion for new trial appellant assigned error in the definition of the term "deliberately" contained in Instruction No. 1.  Said instruction defined that term and others—"willfully," "premeditatedly," etc.,—as those terms are usually defined in a first-degree murder case and directed the jury in substance that defendant was guilty if, either acting alone or jointly with another, he willfully, deliberately, premeditatedly and with malice aforethought shot and killed the deceased.  The instruction as a whole follows generally the form usually adopted in submitting murder where the evidence shows a deliberate killing not done in the perpetration of or attempt to perpetrate robbery, arson, rape, burglary or mayhem.  Homicide committed in the perpetration or attempted perpetration of any of said named offenses is by statute, Section 3982, Revised Statutes 1929 (Mo. Stat. Ann., p. 2778), murder in the first degree and actual deliberation need not be shown.  Proof that the homicide was so committed "deletes the necessity of proof tending to show deliberation, for the statute renders such a state of facts the equivalent of deliberation."  [State v. Moore, 326 Mo. 1199, 1204, 33 S. W. (2d) 905, 906 (1-3).]  The criticism of this instruction is that under the evidence the murder, if committed by defendant, was committed "in the perpetration of a robbery and not to gratify a feeling of revenge or to accomplish some other unlawful purpose."

In connection with said Instruction No. 1 the court gave a further instruction, No. 3, reading as follows:

"The Court instructs the jury that under the law of this State every homicide which shall be committed in the perpetration of an attempt to perpetrate a robbery, is deemed Murder in the First Degree.  And in this case, if the jury find and believe from the evidence, beyond a reasonable doubt, that a homicide occurred while the defendant, either acting alone or jointly with another person, was rob-

bing or attempting to rob the deceased, Charles J. Abeln, then such perpetration or attempt to perpetrate such a robbery stands in lieu of deliberation and premeditation as hereinbefore defined, and the jury will be warranted in finding the defendant guilty of murder in the First Degree and should so say in their verdict.''

The correctness of said Instruction No. 3 is not challenged. Instructions are to be read and construed together. So read the instructions could not have misled the jury. Instruction No. 1 told the jury that, to authorize conviction, the killing must have been done ''deliberately.'' Instruction No. 3 said, in effect, that, under the law, the killing was done ''deliberately'' if done in the perpetration or attempted perpetration of robbery. Said instructions are not in conflict. They supplement each other. This contention is ruled against appellant.

Appellant in his motion for new trial complained of given Instruction No. 4 and the court's refusal to give his requested instructions A and B. Said Instruction No. 4, was a cautionary instruction, in heretofore approved form, as to the weight to be given to the testimony of an accomplice. The criticism of it is that it failed to tell the jury that one accomplice *could not, as a witness*, corroborate the testimony of another witness who was also an accomplice. Defendant's refused instructions A and B were based upon that theory. The contention is that Trimble was an accomplice of appellant, Douthitt and Kennedy in the commission of the crime, therefore, under the law, could not be heard as a witness to corroborate the testimony of his fellow accomplice, Douthitt. The contention cannot be sustained. In the first place the evidence does not show that Trimble was an accomplice in the commission of the crime. It is inferable, as we have stated, that he was an accessory after the fact, but there is no evidence that he was a coconspirator before the commission of the crime or a participant therein. But regardless of that fact appellant's theory is untenable. Under the rule in this State conviction of crime may be had upon the uncorroborated testimony of an accomplice, if believed by the jury. [See State v. Stogsdill, supra.] If two accomplices testify and the testimony of one is sufficient to establish the defendant's guilt, it cannot be that the corroborating testimony of the other is incompetent. The proposition answers itself. If we had a rule that conviction could not be had upon the uncorroborated testimony of an accomplice in the crime charged we might have a different question with which to deal,—a matter which we need not consider.

The foregoing disposes of the assignments of error in the motion for new trial. Appellant appears to have had a fair trial. The verdict, which is in due form, is supported by substantial evidence.

We find no prejudicial error in the record. The judgment of the circuit court is affirmed. *Westhues* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.