STATE v. KENNETH DAVID CONWAY, alias COTTON CONWAY, Appellant.—No. 38215.—171 S. W. (2d) 677.

Division Two, March 25, 1943.

Rehearing Denied, June 7, 1943.

*Frank L. Pulley* and *A. R. Alexander* for appellant.

*Roy McKittrick,* Attorney General, and *Covell R. Hewitt,* Assistant Attorney General, for respondent.

BARRETT, C.—Kenneth David Conway was convicted of murder in the first degree and sentenced to suffer the penalty of death.

By an irrefragable set of circumstances the state's evidence shows that Conway, an habitual criminal, shot and killed Cecil Curd, a filling station attendant, and the question presented by this appeal is whether the proof shows the killing to have been "deliberate and premeditated" compelling a verdict of murder in the first degree. Mo. R. S. A., Sec. 4376.

The state contends that the defendant's motion for a new trial is too general to save the point for review by this court. But paragraph eight of the motion asks for a new trial "because there was no evidence of premeditation or deliberation on the part of the defendant" and we do not see that more could be said to call the

matter to the trial court's attention. It is the existence of premeditation and deliberation which defines, delineates and distinguishes murder in the first degree from other kinds and types of murder and permits the assessment of the death penalty. Mo. R. S. A., Secs. 4376, 4377 and 4378; State v. Eaton (Mo.), 154 S. W. (2d) 767; State v. Reagan (Mo.), 108 S. W. (2d) 391. The assignment is more specific and points out in greater detail and particularity and even more accurately the vice, if any, in the state's case than the assignment in a first degree murder case that "there is no substantial evidence to support the verdict" which was held to comply with the statutory demand that the motion for a new trial "set forth in detail and with particularity . . . the specific grounds or causes therefor." State v. Goodwin, 333 Mo. 168, 61 S. W. (2d) 960; Mo. R. S. A., Sec. 4125. Consequently we are confronted with the problem of whether or not the evidence was such that the only inference the jury could draw was that Conway's killing of Cecil Curd was deliberate and premeditated and, therefore, murder in the first degree, the only degree the jury was permitted to find under the court's instructions.

The state's theory is that the evidence shows a homicide "committed in the perpetration or attempt to perpetrate . . . robbery" and, therefore, the killing is "deemed murder in the first degree," dispensing with proof of deliberation and premeditation in their usually accepted sense. Mo. R. S. A., Sec. 4376; State v. Schnelt, 341 Mo. 241, 108 S. W. (2d) 377; State v. Barr, 340 Mo. 738, 102 S. W. (2d) 629; State v. Moore, 326 Mo. 1199, 33 S. W. (2d) 905. On the other hand, the defendant's position is that the state failed to prove a homicide in the perpetration of a robbery and [679] thereby a deliberate and premeditated murder and for that reason he is entitled to a new trial.

The approved practice is to indict or inform against a defendant, as was done here, charging murder in the first degree in the usual language that he "did then and there with specific criminal intent wilfully, unlawfully, deliberately, premeditatedly, feloniously, on purpose, and of his malice aforethought" assault with a deadly weapon and kill Cecil Curd and then prove that the homicide occurred during a robbery, even though that fact is not charged in the indictment or information, and even though there is no other evidence from which the jury could infer the essential and distinguishing elements of deliberation and premeditation. State v. Nasello, 325 Mo. 442, 30 S. W. (2d) 132; State v. Messino, 325 Mo. 743, 30 S. W. (2d) 750. The " 'deliberation and premeditation' formula, on the one hand," and the statutory named felony-murder rule, on the other hand, perform the function of determining what homicides may be capitally punished. 37 Col. L. R. 701, 706. "No new offenses are created by statutes with relation to murder in the perpetration of,

or attempt to perpetrate, a felony or named felonies; the common-law offense remains the same, having been divided into degrees only. They only prescribe a severer punishment when murder is committed in the attempt to perpetrate a felony, on account of the enormity of the offense, and fix absolutely the degree of the offense, usually as murder in the first degree." Wharton, Homicide, Sec. 118, p. 173. Consequently, if the evidence shows that the murder was committed in the perpetration of a robbery or other statutorily named felony, then the crime is murder in the first degree and the jury could find "only one of two verdicts; namely, conviction of murder in the first degree, or an acquittal." State v. Kauffman, 335 Mo. 611, 73 S. W. (2d) 217; State v. Hart, 292 Mo. 74, 237 S. W. 473; State v. Jackson, 340 Mo. 748, 102 S. W. (2d) 612; State v. Yeager.(Mo.), 12 S. W. (2d) 30.

But even so the fact remains that if the state's theory is that Conway killed Cecil Curd in the perpetration of a robbery it was incumbent upon the state to show by direct or circumstantial evidence that a robbery was perpetrated or attempted. *"On a trial for homicide committed during the perpetration of, or attempt to perpetrate, another felony, the fact that defendant was engaged in the commission of a felony at the time of the killing must be established beyond a reasonable doubt, and every element of the offense must be so established, but need not be demonstrated to an absolute certainty, and may be shown by circumstantial evidence, or by the statement of defendant."* 30 C. J., Sec. 549, p. 303; State v. Wright, 337 Mo. 441, 85 S. W. (2d) 7; Wharton, Homicide, Sec. 614, p. 952; the annotation in 63 L. R. A., 353, 397 398-399; State v. Donnelly, 130 Mo. 642, 32 S. W. 1124; State v. Greenleaf, 71 N. H. 606, 54 Atl. 38; Pliemling v. State, 46 Wis. 516, 1 N. W. 278. And, therefore, the question for our determination is whether there was any evidence that Conway was a party to an attempted or accomplished robbery during the course of which he shot and killed Cecil Curd.

Several people identified Conway and his accomplice, Don Stephens, as the strangers seen in Gower during the late afternoon and early evening of October 25, 1939. Some noticed that they were driving a black Ford automobile with an Oklahoma license plate on it. They were not seen in the D-X filling station about two and one-half miles from Gower on Highway 169 where Cecil Curd was killed, but Stephens was shown to have been there because his finger-prints were found on a coffee cup and Conway admitted that they were there. Mr. Dalrymple owned the station and lived upstairs. Between eleven and twelve o'clock he went upstairs to bed leaving Cecil alone and in charge. Some time later he was conscious of the fact that there was someone in the station asking for coffee. He went to sleep and was awakened by the sound of someone running across the floor and a car starting and driving away. When he got

downstairs he found Cecil Curd lying on the floor behind the counter dead. He aroused the neighbors and soon officers and others arrived.

During that night William Strange, a school teacher, was acting as night watch for his father in the town of Smithville and while he was in a garage about 3:15 a car drove in through the driveway of the garage and up the street for some distance and turned around. They stopped and appeared to be tampering with a parked car and by the time the car came back Strange was standing at the corner of the bank [680] building and was able to write the license number of the car on the side of the building as it passed. The license plate was Oklahoma 39AE037. Though Strange did not personally observe it he knew that the occupants of the Oklahoma car had stolen a doctor's automobile which was later abandoned on the highway. Strange called the Kansas City Police Department and notified them that a Ford with an Oklahoma license tag was headed in that direction and that one of the two men in it had stolen a car in Smithville. At that time he did not know of the homicide near Gower.

Two police officers saw the described automobile entering Kansas City at a speed of about sixty miles an hour and chased it through the streets of Kansas City for about twenty blocks. On Fifteenth Street the occupants jumped out of the car and it crashed into a parked cab. The driver of the car ran north and the other person ran south. Officer Johnson went after the man who ran south but was unable to catch him. Officer Hiles followed the man who ran north and found him lying down on a concrete walk back of an apartment house at Fifteenth and Central Streets. This man was Conway and just a few feet away was a .380 automatic pistol under some leaves. (Later a ballistics expert identified the pistol as being the same one that fired the shell from an empty cartridge case found in Dalrymple's filling station. Conway had stolen the pistol in Oklahoma City.) Conway was then taken to police headquarters where he was questioned by Mr. Reed of the police force, Highway Patrolman Baxter and F. B. I. agent Farland. During the progress of that examination Conway revealed Stephens' hiding place and he and a girl were arrested there about 3:45 o'clock in the morning.

Officers Hiles and Johnson, the policeman who chased and caught Conway, found a cap, two flashlights and a sack in the automobile Conway had been driving. But they said they found nothing in his possession except his clothes and the pistol under the leaves, although they looked. Only one of the officers arresting Stephens and the girl testified and he was not asked and did not say what, if anything, was found in their possession or in the apartment they occupied.

Mr. Dalrymple testified that when he went upstairs to bed he forgot and left his billfold containing ninety-five to one hundred dollars in bills on a shelf back of the stairway and that the next morning it was gone. He also said he left eight or ten dollars for

change with Cecil and that Cecil usually had money of his own which he kept in a billfold in his overcoat. He further said, however, that he did not know how much money was found on Cecil after the murder. He did not know when he had last counted his own money and said he was guessing at the sum. "As to who took the money out of your billfold you know not, do you? No, sir." He said it was the usual thing for people to come in and out of the station while he was asleep and he would not be aware of it.

Mr. Farland, the F. B. I. agent, conducted the examination of Conway at police headquarters. He first talked to him an "hour or two" and later attempted several shorter conversations. He intended to take a written statement but after two or three paragraphs had been written Conway refused to continue with the statement. As a result Farland and others who were present during parts of the examination were only able to testify to such oral admissions as Conway made. Farland was chiefly concerned with the Ford automobile Conway was driving, which had been stolen in Beaumont, Texas. He was also interested in a Buick automobile Stephens and Conway had stolen in another state. When the examination first began it would seem that Farland did not know of the homicide near Gower but learned of it after he had started his examination. It was when he accused Conway of the murder that he refused to continue the written statement.

Farland said he questioned Conway with reference to the murder of this man and he denied it and denied that he had a gun. Later Conway said: "The man was still living when he left." Shortly afterwards he said: "They fired one shot." After Farland told Conway that they knew who had done the shooting from fingerprints on the cups he said: "I suppose this means the electric chair for me."

With reference to whether Conway and Stephens had robbed Curd he was asked this question: *"Did he at any time make any statements in regard to robbery in the station"?* Farland's answer was: *"I don't believe he did."*

On cross-examination he was asked if he did not find that Conway was without [681] means and answered: "To the contrary he said he had something like, something over eleven hundred dollars put away for a defense." Later he said: "The information was obtained that he told Graf (a lawyer) that he had thirteen hundred dollars for his defense." (Here it should be interpolated that the trial court appointed the three lawyers who represent the defendant, and that they performed their duties in a commendable manner, against great odds, and without compensation.) In response to the question of whether he hadn't found Conway to be without means Farland answered: *"They* got a few dollars on them when they were brought in. However, when searched Stephens had no additional money, nor did the woman. . . . Q. Now he had no money with him,

you knew that didn't you, except a few dollars? A. Well, a few dollars, I don't — Q. (interrupting) How much would you say, five or six or five to ten dollars, something like that? A. Possibly so. I know one of them had eight or nine dollars. Whether it was him or the other fellow I just can't recall without going through the notes. Q. Yes, you may go through your notes as much as you want to as to these matters. Would you say that the best of your impression now that Conway didn't have over five or ten dollars with him at the time he was taken into custody? A. I wouldn' say one way or the other. I don't think he had very much. Q. Yes. What do you mean by not very much? A. Well, when I say much, forty or fifty dollars. I think he probably had five or ten dollars, something like that. Q. Yes. A. More or less. Q. You don't think he had as much as forty or fifty dollars? A. I don't think so, no sir. Q. *You didn't search him, I suppose, did you, the other police officers did that?* A. *I believe they did, I didn't.* . . . Q. Yes. You knew he had no money on his person or a very limited amount didn't you? A. *Well, when I talked to him he didn't have any money. If he had any before they took it away from him.*"

It is our opinion that this evidence does not show "beyond a reasonable doubt" that Conway and Stephens shot and killed Cecil Curd while perpetrating or attempting to perpetrate robbery. "Every person who shall be convicted *of feloniously taking the property of another from his person, or in his presence,* and against his will, by violence to his person, or by putting him in fear of some immediate injury to his person; or who shall be convicted of feloniously taking the property of another from the person of his wife, servant, clerk or agent, . . . by violence to the person . . . shall be adjudged guilty of robbery in the first degree." Mo. R. S. A., Sec. 4450. That is our statutory definition of the grade of robbery this defendant is supposed to have committed, possibly with the added fact that the robbery was supposed to have been attempted or accomplished by means of a dangerous and deadly weapon. Mo. R. S. A., Sec. 4453. "The crime of robbery in the first degree includes all the elements of larceny with the added acts of violence or the putting of the victim in fear of some immediate injury to his person." State v. Lasky (Mo.), 133 S. W. (2d) 334, 335.

Assuming that the jury should have been permitted to find the presence of all the other elements of robbery from the circumstances detailed, yet there was no evidence from which they could infer or find that Conway or his accomplice were guilty of "taking the property of another," which is an essential element of the crime. Mo. R. S. A., Sec. 4450, 54 C. J., Secs. 167, 168, 172. Even though the robbery need not be charged in the indictment or information (State v. Nasello, supra) and even though it may not be necessary for the court to define robbery in the first degree (State v. Messino, supra)

yet, as we have indicated, when the theory is that the crime is murder in the first degree. because committed in the perpetration or attempt to perpetrate a robbery the state must prove, by direct or circumstantial evidence and beyond a reasonable doubt, every element of the offense before the jury may inflict the death penalty.

Mr. Baxter of the highway patrol and Mr. Reed of the Kansas City Police Department were present part of the time Farland was questioning Conway but neither of them was asked or testified to any admissions concerning robbery and Farland specifically stated that Conway did not make any admissions of robbery. We have underscored that part of Farland's evidence dealing with the money found on either Conway, Stephens or the girl and it is [682] obvious, in the first place, that what he had to say on the subject was hearsay. In the second place, it is doubtful that such evidence as he gave on the subject tended justly to show Conway guilty of robbery or that the money found on either of them came from the alleged crime. Compare: Annotation 3 A. L. R. 1213 and State v. Williams (Mo.), 183 S. W. 308. None of the officers who arrested and searched any of the parties testified to finding any sum of money on or near any of them. And they were the people who possessed the best and only information on the subject. Construing all the evidence liberally there is nothing in it to show that Conway or his accomplice admitted a robbery or an attempt to rob, nor is there any evidence to show that either of them had any money or property which could have or did come from the D-X filling station near Gower.

Of course, that is not conclusive if there is any other evidence from which it could be found that the defendant or his accomplice took money or other valuables from the filling station, but we are unable from this record to find it. Mr. Dalrymple said he forgot and left some money in his billfold, on a shelf, back of the stairway when he went to bed at ·eleven and that next morning it was gone. It is not clear whether both the billfold and the money were gone or only the money. Nor is the time next morning fixed as to when it was discovered the money was missing and between the time it was left and missed and after Cecil's having been murdered there were a great many people in and out of the station.

The most that could reasonably be found from Mr. Dalrymple's evidence is that he had lost his property through a larceny.

Several people, including Mr. Dalrymple, saw Cecil lying on the floor behind the counter and Dr. Starks, Allen Hawkins, a neighbor boy, two highway patrolmen and the coroner examined him closely and fully and yet no one testified as to what, if anything, was missing or found on his person by way of money or valuables. Neither was there any evidence as to the condition of his clothes, such as his pockets being turned out or an indication that his clothes had been rifled. (State v. McNeal (Mo.), 237 S. W. 738; State v. White, 330

Mo. 737, 51 S. W. (2d) 109; State v. Page (Mo.), 130 S. W. (2d) 520.) Though it was said that he had money of his own and Mr. Dalrymple's as well, it was not shown that it was missing and certainly such evidence was available.

As we have pointed out, the purpose of the statute making a homicide in the commission of a robbery, or other named felony, murder in the first degree is to fix absolutely the degree of the offense and thereby permit the assessment of the death penalty. The facts in the instant case do not show a homicide in the commission of a robbery and are not such that the jury should be permitted to draw the inference from them that there was. In all the previous cases the evidence has shown beyond a reasonable doubt that the homicide was committed in the perpetration of a robbery or other statutory named felony. In every one of the cases there was either an admission (such as a confession or a statement) of the felony by the accused or a witness who could and did positively testify that a robbery preceded the homicide and the defendant has usually been identified as a participant in the robbery and murder, or the evidence conclusively showed the robbery to have been committed. See and compare: State v. Wilson, 172 Mo. 420, 72 S. W. 696; State v. Brooks, 220 Mo. 74, 119 S. W. 353; State v. Mabry, 324 Mo. 239, 22 S. W. (2d) 639; State v. Messino, supra; State v. Nasello, supra; State v. Aguelera, 326 Mo. 1205, 33 S. W. (2d) 901; State v. Glover, 330 Mo. 709, 50 S. W. (2d) 1049; State v. White, supra; State v. Jefferson, 334 Mo. 57, 64 S. W. (2d) 929; State v. Powell, 339 Mo. 80, 95 S. W. (2d) 1186; State v. Jackson, 340 Mo. 748, 102 S. W. (2d) 612; State v. Richardson, 340 Mo. 680, 102 S. W. (2d) 653; State v. Barr, 340 Mo. 738, 102 S. W. (2d) 629; State v. Schnelt, 341 Mo. 241, 108 S. W. (2d) 377; State v. Kennedy (Mo.), 108 S. W. (2d) 384; State v. Morefield, 342 Mo. 1059, 119 S. W. (2d) 315; State v. King, 342 Mo. 1067, 119 S. W. (2d) 322. There is no such showing in the instant case and since it was and is the state's theory that the proof was of a homicide in the commission of a robbery, thereby dispensing with evidence of premeditation or deliberation, the defendant is entitled to a new trial. Our suspicion that the defendant was engaged in the perpetration of a robbery at the time, regardless of how strong the feeling may be, cannot supply or take the place of evidence establishing the necessary elements of the crime. State [683] v. Pippin, 327 Mo. 299, 36 S. W. (2d) 914; State v. Davis, 337 Mo. 404, 84 S. W. (2d) 633.

Before Conway was tried for murder he was confined in the United States Penitentiary at Leavenworth, Kansas, and was returned to Clinton County on writs of habeas corpus ad prosequendum directed to the United States Marshal for the Western District of Missouri and the Warden of the penitentiary at Leavenworth by the Circuit Court of Clinton County for arraignment, appointment of .

counsel, and trial. The defendant contends there is no authority for such procedure and that the trial court did not have or acquire jurisdiction of the person of the defendant by getting him before the court in that manner. This point we need not decide. But see: Ponzi v. Fessenden, 258 U. S. 254, 42 S. Ct. 309, 66 L. Ed. 607; Pettibone v. Nichols, 203 U. S. 192, 27 S. Ct. 111, 51 L. Ed. 148; 14 Am. Jur., Sec. 214 and the notes in 22 A. L. R. 886 and 62 A. L. R. 279. There is a vast difference in the criminal law in the court's not having jurisdiction of the subject matter and not having jurisdiction of the person of the accused. The former is never waived, as the cases cited by the appellant indicate, while the latter is waived when the defendant enters a plea of not guilty and without other objection proceeds to trial as was done in the instant case. Compare: 14 Am. Jur., Sec. 214; Henry v. Henkel, 235 U. S. 219, 35 S. Ct. 54, 59 L. Ed. 203; Ex parte Lamar, 274 Fed. 160.

The judgment is reversed and remanded. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by Barrett, C., is adopted as the opinion of the court. All the judges concur.

### On Motion For Rehearing.

PER CURIAM:—In its motion for a rehearing the state does not object to the principles applied but contends that we have overlooked the effect and purport of certain evidence; evidence from which the jury did and should be permitted to find that Conway was engaged in the perpetration of or attempt to perpetrate a robbery when he shot and killed Cecil Curd. The state's position is that by circumstantial evidence it discharged its obligation of proving beyond a reasonable doubt that Conway and his accomplice were engaged in the commission of or attempt to commit a robbery.

The state again points to Mr. Dalrymple's evidence, especially his testimony that before he went upstairs to bed he forgot and left $95.00 to $100.00 in his billfold "on the shelf behind the stairway" and the next morning it was gone. He also testified that he left eight or ten dollars with Cecil for the purpose of making change and that Cecil had some money of his own. He said Cecil kept the station money in his overall pocket and his own money "in a billfold up here in his overcoat." In our principal opinion we pointed out the objections to and the weaknesses of all this evidence and indicated why we thought it insufficient to sustain the state's theory of its case. A re-examination of the record has not changed our views but there is one further circumstance strongly corroborative of what we have already said.

The appellant's twenty-fourth assignment in his motion for a new trial is as follows: "Because the state offered testimony to the effect

that money was missing from the body of deceased (Curd) shortly after the homicide by witness Dalrymple, thereby implying that defendant had taken said money, when in truth and in fact said moneys had been taken from the body of deceased by the coroner of Clinton County and also by the undertaker, as appears from the affidavit of Dr. A. D. Templeman, Coroner, attached hereto. And said facts first came to the knowledge of defendant and his counsel after the verdict of the jury was rendered, although due diligence by defendant's counsel was exercised in attempting to learn these facts, which facts they did not at the time know.''

The attached affidavit of Dr. Templeman is as follows: ''I, A. D. Templeman of lawful age and residing in Cameron, Clinton County, Mo. and after being first duly sworn on oath state, that I am a regularly licensed and practicing physician at Cameron, Mo.; that during the year 1939 I held the office of Coroner of said Clinton County, and that in the performance of my duties as Coroner I went to a point near Gower to a filling station, in response to a telephone call, and there viewed and examined the body of one Cecil Curd, who had been shot and killed. I took from a bib pocket [684] of his overalls (I believe from an inside pair of overalls) a pocketbook containing the sum of four and 45/100 dollars. Mr. Curd's brother, Paul, told me that the pocketbook belonged to his murdered brother, Cecil, so I gave Paul Curd the custody of the pocketbook and money, receiving a receipt for the same.

At the undertaker's establishment, Lucis Daius, Dearborn, Mo., one dollar and forty-five cents was found scattered through several pockets of Cecil Curd's clothing and this money was also given to the custody of Paul Curd and a receipt was taken.''

We do not agree that Mr. Dalrymple's evidence is subject to all the constructions appellant's counsel attribute to it, neither do we indicate that the appellant was or was not entitled to a new trial because of newly discovered evidence but if the facts stated in the motion and affidavit with reference to the money are true, and there is every indication that they are, they are not only strongly corroborative of what we have already said in our principal opinion with respect to the sufficiency of the proof of a robbery but also indicate the availability of evidence as to what actually became of some of the money supposed to have been taken from Curd's person or presence.

There is not the slightest evidence, either direct or circumstantial, of an attempt to commit a robbery of any degree—if the circumstances are permissive of any inference in the state's favor it is that Conway and his accomplice were engaged in the actual perpetration of a robbery as defined by Mo. R. S. A., Secs. 4450 and 4453, that is, robbery in the first degree. As we pointed out, the statute (4376) dispenses with proof of premeditation and deliberation and absolutely fixes the degree of the offense as murder in the first degree, per-

mitting the assessment of the extreme penalty of death. Considering and weighing all the evidence, with knowledge of the purpose and effect of the statute, it does not present that strong set of circumstances required to discharge the state's obligation of proving beyond a reasonable doubt every element of the offense and particularly that Conway was engaged in the perpetration of a robbery when he shot and murdered Curd.

The motion for rehearing is overruled. *Ellison* and *Tipton, JJ.,* concur; *Leedy, J.,* dissents.